TEXARKANA BUS CO., Inc., et al. v. NATIONAL LABOR RELATIONS BOARD.

No. 499, Original.

Circuit Court of Appeals, Eighth Circuit.

April 30, 1941.

Ned Stewart, of Texarkana, Ark. (Paul Jones, Jr., of Texarkana, Ark., on the brief), for petitioners.

Maurice J. Nicoson, Atty., National Labor Relations Board, of Washington, D. C. (Robert B. Watts, Gen. Counsel, Laurence A. Knapp, Associate Gen. Counsel, Ernest A. Gross, Asst. Gen. Counsel, Samuel Edes, Atty., National Labor Relations Board, David C. Sachs, Atty., National Labor Relations Board, and Malcolm A. Hoffmann, Atty., National Labor Relations Board, all of Washington, D. C., on the brief), for respondent.

Before GARDNER, SANBORN, and THOMAS, Circuit Judges.

GARDNER, Circuit Judge.

This is a petition for review of an order of the National Labor Relations Board filed by the petitioners Texarkana Bus Company, Inc., referred to in the record as Bus Company, and Two States Transportation Company, Inc., referred to in the record as Taxi Company. They will be so referred to in this opinion.

The order was entered after hearing on complaint filed by respondent based upon charges made by the Amalgamated Association of Street Electric Railway and Motor Coach Employees, affiliated with the American Federation of Labor, charging petitioners with certain unfair labor practices. With respect to the unfair labor practices, the Board found (1) that petitioners had each violated Section 8(1) of the National Labor Relations Act, 29 U.S.C.A. § 158(1), by preparing and requesting their employees to sign letters renouncing the Amalgamated as collective bargaining representative; (2) that the Bus Company had required its employees to disclose their union affiliations; (3) that the Bus Company had discriminatorily discharged one of its employees, Thomas; (4) that the Bus Company had expressed opposition to the organizational efforts of its employees; (5) that the Bus Company had been guilty of discrimination in the hire and tenure of four employees, Pierce, Whatley, Jr., Goss, and Herndon, Jr., and (6) that the Bus Company had refused to bargain collectively with the Amalgamated although that organization was the majority representative of the employees in an appropriate unit. Upon these findings the Board entered a cease and desist order and as affirmative relief ordered the Bus Company (a) to offer reinstatement with back pay to Pierce, Whatley, Jr., and Goss; (b) to make whole Pierce and Herndon, Jr., for losses of pay suffered by them as the result of their discriminatory suspensions; (c) upon request, to bargain collectively with the Amalgamated; and (d) to post appropriate notices.

Petitioner Texarkana Bus Company, Inc., attacks the sufficiency of the evidence to sustain the findings of the Board, alleges that the Board erred in ordering reinstatement of the discharged employees; that it erred in ordering the Bus Company to make whole each of the employees alleged to have been improperly discharged; that it erred in ordering the Bus Company to make good any loss of pay by reason of suspension of the employees mentioned; that the Board erred in ordering the Bus Company to bargain collectively with the Amalgamated Union and in requiring it to post notices.

Petitioner, Two States Transportation Company, Inc., attacks the sufficiency of the evidence to sustain the charge that it in any manner interfered with, mistreated or coerced its employees in the rights guaranteed to them in Section 8(1) of the National Labor Relations Act, and that the Board erred in ordering it to post notices.

The Bus Company is engaged exclusively in carrying passengers in commercial busses between the twin cities of Texarkana, Arkansas, and Texarkana, Texas, while the Taxi Company is engaged exclusively in the operation of taxi cabs for transportation purposes between and through the twin cities of Texarkana, Arkansas, and Texarkana, Texas. These cities are substantially one city, separated only by the state line between Texas and Arkansas. The companies are owned by the same stockholders, managed by the same directors, and officered by the same officers. C. E. Mitchell is the president, Bero Eldridge vice-president, and Joseph Eldridge secretary-treasurer. The companies, however, are operated as two separate and distinct companies, and it is conceded that both of them are engaged in interstate commerce within the meaning of the Labor Relations Act.

We shall first consider the Act as it relates to the practices of the Bus Company. That company requires each of its

employees to fill out and sign an application form, naming "any lodge, labor or benefit organization of which you are a member." This practice was adopted in 1935 before the enactment of the Labor Relations Act, 29 U.S.C.A. § 151 et seq., but it was continued after the passage of that Act, and it was in use as late as 1939. Inquiry by the employer of the employees' union affiliations has been held to be violative of the Act. N. L. R. B. v. Bradford Dyeing Ass'n, 310 U.S. 318, 60 S.Ct. 918, 84 L.Ed. 1226; N. L. R. B. v. J. Freezer & Son, Inc., 4 Cir., 95 F.2d 840; N. L. R. B. v. Hearst, 9 Cir., 102 F.2d 658. In June, 1939, the officers of the Bus Company prepared letters on company stationery, addressed to "Mr. J. D. Elliott or To whom it may concern," reading as follows:

"Gentlemen: The purpose of this letter is to advise you that I do not wish for you or anyone else to bargain for or make any kind of a contract for me or in my behalf with the Texarkana Bus Company, Inc.

"Yours truly,"

They then invited practically all of the drivers for the Bus Company to their office and requested each to sign a copy. Only two of the employees so interviewed declined to sign. Many of the men signing testified that they did not know what they were signing. One driver was told that "it didn't concern the union." The J. D. Elliott addressed was an organizer for the Amalgamated and was then actively engaged in attempting to organize the employees of the Bus Company and have them join the Amalgamated Union. This was done immediately following a meeting attended by Mr. Elliott, a committee of the members of the Amalgamated Union, and the officers of the Bus Company. The letter was not only addressed to Mr. Elliott, but "To whom it may concern," and recited that its purpose was to advise that the signer of the letter did not "wish for you or anyone else to bargain for or make any kind of a contract for me or in my behalf with the Texarkana Bus Company, Inc." The letter announced in effect that the signer did not wish anyone to bargain for him. The Board was warranted in believing that this was a manifest attempt to influence the employees in a matter of labor organization and to forestall, if possible, the selection of a representative to bargain collectively for the employees.

■ An attempt was made to organize the employees of the Company in 1935. At a meeting of the employees in September of that year, it was decided to secure a charter from the Teamsters' Union, and an employee by the name of Thomas was elected temporary treasurer. The following morning he was advised that he was suspended for a ninety day period. While the evidence is in dispute, the Board might have believed therefrom that Mr. Eldridge told Thomas that he did not think the employees ought to have organized the Truckers' and Teamsters' Union, but that they ought to have a union of their own. In the same conversation in which Thomas was told that he had been suspended, Thomas indicated that he was in favor of organizing the union, to which Eldridge replied that if that was his attitude toward the Company, he was fired, and he was thereupon discharged. The Board from this evidence was warranted in finding that the discharge of Thomas was because of his union activities, and for the purpose of discouraging the organization of the employees. N. L. R. B. v. Remington Rand, Inc., 2 Cir., 94 F.2d 862.

■ The effort to organize the employees in 1935 having failed, in 1937 they secured a charter from the International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers, and a majority of the employees joined. Within a few days the president questioned Mr. Whatley, one of the employees, saying that he would have liked for the employees to have gotten into their own union. At a meeting of the day shift drivers called by the president of the company, he said that, "He was very much hurt that the boys had joined the union without talking to him about it." The drivers were interrogated why they joined the union and told that, "The Company didn't want them to be in a union with truck drivers." At the same meeting, the men were told that the company rules were being compiled and that the management could find things in this book of rules for which to discharge employees other than belonging to the union. This was sufficient evidence to sustain the Board's finding that the Bus Company was attempting to coerce and interfere with the union activities of its employees. N. L. R. B. v. Falk Corp., 308 U.S. 453, 60 S.Ct. 307, 84 L.Ed. 396.

■ Prior union organizations having apparently been abandoned, in 1939 a special organizer for the Amalgamated Union began a movement among the employees of the Bus Company to organize a union, and on June 12, a charter was obtained. Driver

Whatley was made temporary president and driver Herndon was made temporary secretary-treasurer. Shortly thereafter, Mr. Eldridge said to one of the drivers that the union "would be a good thing for the fellows to stay out of; that it would just cause a lot of trouble." Immediately following the initial organization efforts, Whatley, then president of the Amalgamated Union, Pierce, and other members of the union were shifted from the day run to the less desirable night shift. Following this was the effort to have the employees sign the letter above referred to. This series of acts was, we think, substantial evidence supporting the finding that the Bus Company had violated Section 8(1) of the Act.

■ The Board also found that on June 13, 1939, the Bus Company refused to bargain collectively with the Amalgamated Union, although that organization was a majority representative of the employees. It appears from the evidence that on the afternoon of June 13, 1939, the organizer, J. D. Elliott, and a committee of bus drivers, consisting of Pierce, Herndon, Whatley, Brown and Westmoreland, came to the bus station. Elliott introduced himself as the representative of the Amalgamated Union. Mr. Eldridge asked him to show some proof that he represented a majority of the men. Elliott replied that he didn't have to, but that Mr. Eldridge would have to take his word. Mr. Mitchell offered to permit Elliott to check the payroll records against the membership of the union to ascertain if the union represented a majority of the drivers, but this Elliott refused to do. Mr. Mitchell wanted to see the list of the union members to determine whether or not there was a majority. This was declined. Elliott said that he had fourteen out of twenty-three drivers signed up. Mr. Eldridge replied, "Before we can bargain with you, we must know that you have a majority of the members." Mr. Elliott in his testimony said that it was the policy of his organization for many years "to tell them nothing." He stated that the officers asked him for proof but that he took the position that he did not have to show any proof. Mr. Eldridge testified that he had been willing at all times to bargain collectively with the Amalgamated when shown that it represented a majority, and denied that he had ever refused to so bargain. The Bus Company was under the obligation of conferring with the authorized representatives of its employees and to listen to their complaints, but it was not under any duty to recognize or confer with an alleged representative who produced no proof that he in fact represented a majority of the employees. In its Fourth Annual Report, the National Labor Relations Board, at page 65, says: "Section 8(5), of course, does not require an employer to bargain collectively with a union which has not been designated by a majority of the employees in an appropriate unit. The Board, accordingly, has refused to find a violation of section 8(5) unless the designated representative, on request, shows the employer that it has been thus selected." Here, it appears without dispute that although the employer made request, there was no proof that the Amalgamated represented a majority of the employees. As said by the Supreme Court in Virginian Railway Co. v. System Federation, 300 U.S. 515, 57 S. Ct. 592, 600, 81 L.Ed. 789, the law "imposes the affirmative duty to treat only with the true representative, and hence the negative duty to treat with no other." As the employer must act at his peril in recognizing a representative, common prudence dictates that he refrain from acting until satisfactory proof is produced that the representative in fact speaks for a majority of the employees. While the officers of the Bus Company may not have been entitled to be furnished with a list of the members, they were entitled to evidence that the representative in fact spoke for a majority of the employees. There was no evidence that the Bus Company was refusing to bargain with a representative of any union certified to the employer as a bargaining agency of the employees as the result of an election. The employer can not be required to devote his time to negotiating with every individual claiming to represent a bargaining unit, and can not be charged with unfair practice in this regard unless there is presented to him evidence of a substantial character showing that the representative is in fact an authorized bargaining agency. N. L. R. B. v. Empire Furniture Corp., 6 Cir., 107 F.2d 92. No unfavorable inference should be drawn from the fact that the Bus Company's officers refused to bargain with Elliott in the absence of substantial proof that he was in fact a representative of the majority of the employees. Our conclusion in this matter will eliminate subdivision 1(b) of the Board's order, but will not affect subdivision 2(d) of the order because the Board has found, and its find-

ing is sustained by substantial evidence, that the Amalgamated, on June 13, 1939, and at all times thereafter, was the duly designated representative of a majority of the Bus Company's employees for collective bargaining.

█ The Board found that William B. Pierce was discriminatorily shifted from the day to the less desirable night shift and thereafter improperly suspended for a period of forty-five days and finally discharged. Without going into the details of the evidence on this question and the circumstances under which these acts were committed, we are of the view that the finding is sustained by substantial evidence.

The Board found that Robert L. Whatley had been discriminatorily shifted from the day to the less desirable night shift and had been improperly discharged for union activities. This finding too, we think, is sustained by substantial evidence.

█ The Board found that George A. Goss was discriminatorily refused reinstatement in November, 1939, following a two weeks leave of absence granted by the company. It is the contention of the Bus Company that Goss voluntarily quit its employ and that his failure to secure reemployment involved no violation of the Act. It appears from the evidence that Goss told a fellow employee that he was going to write to Detroit, where he had been employed as a driver, and that he might go up there to see about a job. He wrote a Detroit friend, who advised him that there was plenty of work up there and that he was sure Goss could get a job. Later, Goss met Mr. Eldridge on the street and told Eldridge that he was going to Detroit as he had a job up there, saying that he wanted to quit. Goss testified that he told Mitchell that he wanted a two weeks lay off to go to Detroit to look for another job. Goss announced that "He was quitting and going to Detroit to take a better job, or get a better job, or something in that behalf." He told the witness Carroll that he guessed Carroll would get his job when he left "because he was not coming back." The witness Lennox testified that he said: "I am gone. I am going back to Detroit. I can go back up there and be making $8.00 or $12.00 per day while I am fooling around here with a $2.50 taxi job, and I am going back up there." He told Huffman that he was leaving and going to Detroit where he could make three or four times as much money as he made here. The witness Champion heard Goss tell other drivers that he was going to Detroit; that he had worked up there for a long time and was going back. He told the witness Giles that he was quitting and going to look for a better job in Detroit. He told the witness Wright that he was going to Detroit to get a job and that a friend had written him that there was plenty of jobs up there. It appears also that while preparing to depart for Detroit, he tried to sell his equipment to a number of drivers. Goss asked for and received a letter of recommendation. This letter recites that, "Mr. Goss has terminated his connection with this company voluntarily, for the purpose of going East in search of more profitable employment." He used this letter in Detroit. Apparently Goss failed to secure a satisfactory job in Detroit and returned to Texarkana. Carroll had his place. He called to see Mr. Mitchell, who said that it didn't seem fair to turn off Carroll and put him on, but advised him to drop in once in a while to see if there was an opening for him to go back to work. Apparently not until January 15, 1940, did Goss again call to see about a job. In the meantime other drivers had been taken on from November 6 to January 15, but the Act does not take from the employer his right to select his own employees. Mitchell had not agreed to call Goss, but told him to "drop in" if he wished to see further about getting a job. When Goss in fact called on January 15, he said nothing to indicate that he had merely been on a leave of absence, or that he was entitled to be taken back as a regular driver. He was interrogated as follows:

"Q. Did you go back after November of 1939 and try to get work with the Texarkana Bus Company? A. Yes, sir; I met Mr. Mitchell around the 15th of January and asked him if he didn't have some extra work that he could let me have. * * * He said that he was pretty well filled up and that is all he said."

So far as appears from the record, he did not again confer with Mr. Mitchell, and it is observed that he asked not to be taken back as a regular driver, but inquired whether or not there was not some "extra work." It was manifestly recognized by both parties that the relation of employer and employee no longer existed. That being true, the Board was not warranted in ordering the Bus Company to reinstate Goss. N. L. R. B. v. National Motor Bearing Co., 9 Cir., 105 F.2d 652. In any event,

the company was not obliged to discharge a driver in order to make room for him. N. L. R. B. v. Bell Oil & Gas Co., 5 Cir., 98 F.2d 406. At most the evidence gave support to either of two equally justifiable inconsistent inferences and hence proved neither. Pennsylvania Ry. Co. v. Chamberlain, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819; Bussman Mfg. Co. v. N. L. R. B., 8 Cir., 111 F.2d 783. As the burden of proof was upon the Board to prove its charges by a fair preponderance of the evidence (Cupples Co. Manufacturers v. N. L. R. B., 8 Cir., 106 F.2d 100), this finding must fail for want of substantial evidence.

■ The Board found that E. A. Herndon, Jr., who was temporary secretary-treasurer of the Amalgamated, and a member of its bargaining committee, was discriminatorily suspended because of his union activities. Herndon was suspended for fifteen days in September, 1939, for the stated reason that he failed to attend a safety meeting. On the day of the meeting he was not required to report for duty before 2:50 p. m. He arrived at 2:15 p. m. and for the first time observed a notice posted on the bulletin board calling a meeting of night drivers for 2:00 p. m. No notice of this meeting had been posted the previous night, as was the custom. It also appears that others who failed to attend such meetings had not been disciplined. We think the evidence and the inferences that may properly have been drawn from the attending circumstances, warranted the finding that the suspension of Herndon was discriminatory.

■ We now turn to the case of the Taxi Company. No attempt was being made to organize the drivers of this company. In fact, there is no evidence that the drivers interested themselves in any labor organization. Two of these drivers signed the letter addressed to Elliott and "To whom it may concern," stating that they did not wish him or anyone else to bargain for them "with the Texarkana Bus Company, Inc." They were not employees of the Texarkana Bus Company, Inc., and this had no reference whatever to the Taxi Company. The trial examiner, in reserving his decision on motion to dismiss as to this company, said: "My notes are not complete and I hesitate to make a ruling, although I will concede—I believe Board's counsel concedes, for that matter—that the proof tending to tie up the Two States Transportation Company is meager." We think the evidence is not substantial and the complaint should have been dismissed as to the Taxi Company.

■ Since the Board entered its order in this matter, the Supreme Court in Republic Steel Corp. v. N. L. R. B., 311 U.S. 1, 61 S.Ct. 77, 85 L.Ed. —— held that the Board was without authority to deduct from the net earnings of a reinstated employee earned during the period of his discharge, moneys received from relief agencies, or to order such moneys paid over to such agencies. That provision of the Board's order directing such payment should be stricken.

■ It is also urged that the notice provisions of the order require petitioner to make a confession of guilt. The notices should require the Bus Company to advise its employees that the company will not engage in the conduct from which it is ordered to cease and desist. We do not think the notices violative of any rights of the Bus Company. Speaking on this subject, the Supreme Court in National Labor Relations Board v. Express Publishing Co., 61 S.Ct. 693, 701, 85 L.Ed. —— decided March 3, 1941, said: "Since the Board has changed its practice and now provides in all orders that the employers' notices shall state 'that he will not engage in the conduct from which he is ordered to cease and desist' it consents that the present order be modified accordingly."

In the instant case, in the interest of uniformity, the notices should be made to conform to that approved by the Supreme Court in National Labor Relations Board v. Express Publishing Company, supra. The notices will then read that Texarkana Bus Company, Inc., "will not engage in the conduct from which it is ordered to cease and desist."

As modified by this opinion, the order of the Board is affirmed and will be enforced.