**NATIONAL LABOR RELATIONS BOARD**
**v. LOVVORN.**

No. 12367.

United States Court of Appeals
Fifth Circuit.

Feb. 11, 1949.

David P. Findling, Associate Gen. Counsel, NLRB, Ruth Weyand, Acting Asst. Gen. Counsel, NLRB, and Abraham H. Maller, all of Washington, D. C., for petitioner.

Murphey Candler, Jr. and John Wesley Weekes, both of Decatur, Ga, for respondent.

Before HUTCHESON, WALLER, and LEE, Circuit Judges.

HUTCHESON, Circuit Judge.

The Board proceeding resulting in the order sought to be enforced involved a small cotton mill, which was located in Forsythe, Georgia, and employed approximately eighty-seven persons. It grew out of the efforts of Textile Workers Union of America C.I.O. to organize the plant, represent the workers therein as exclusive bargaining agent, and to obtain a closed shop agreement.

It was tried on a complaint filed December 4, 1946, charging Lovvorn, sole owner of the Georgia Twine & Cordage Co., with unfair labor practices. The specific charges were: (1) That on or about July 22, 1946, the union, being then and there the representative of a majority of the employees, did request respondent to bargain collectively with it as exclusive representative of the employees, and the request was refused; (2) that at all times since he has refused to so bargain; (3) that on July 22, he closed the plant and locked out all employees in order to discourage membership in the union, and (4) since that date, by surveillance and other prohibitive acts, he has interfered with and prevented the self-organization of his employees and the exercise of their guaranteed rights.

There was an intermediate report finding respondent guilty of unfair practices, including the lock-out, substantially as charged. The Board, finding that the shutdown was for repairs and not a lock-out, disapproved the finding and dismissed the charge that it was.

The Board, however, found: that the union did on July 22, as claimed, attain majority status; that the respondent did then and thereafter unlawfully refuse to bargain with it; and that he had gone

about to undermine the union by granting a general wage increase and by abetting and aiding in the circulation of a petition opposing the union and withdrawing from membership in it.

Though, then, it was established by undisputed evidence that a majority of the employees, fifty-eight out of eighty-seven, had signed and delivered to respondent a petition headed "We, the undersigned employees, are opposed to a closed shop and are opposed to union membership", and that by August 5th the Union had lost its majority position, the Board ordered respondent to bargain with it. It did this because it found that respondent, having by his action undermined the union, ought not to be permitted to take advantage of his own wrong, and it is here seeking, as it has successfully done in many similar cases, enforcement of its order.

Respondent, opposing enforcement, insists that the evidence does not support the Board's findings, that the union was the real choice of the majority of the employees, and that respondent, knowing it was the chosen representative, refused to bargain with it. It insists that, on the contrary, the evidence shows merely, that the union put on a "whirlwind campaign" of procuring signatures, that having in two or three days procured what it declared was a majority, it then demanded recognition and bargaining, and, before the employer could determine the correctness of the claim, the employees, of their own accord, had evidenced their opposition to having the union represent them.

Respondent, therefore, insists that if the employer had thereafter recognized the union as the bargaining representative, he would have done violence to the very right of self-organization which the invoked statute guaranteed to employees.

Upon the finding that the initiation and circulation of the employees' petition was directed or aided in, or abetted by, the employer, he insists that no credible evidence supports this view, but that all the credible evidence is convincing that it was purely an employee movement.

As to the pay raise, respondent, with great circumstantiality, argued that this was decided upon before the union had appeared, and that its offering was in no sense part of a plan to circumvent the union.

A careful reading of the record leaves us in no doubt that the overall effect of the evidence is to sustain the findings of the Board: that the union, on July 22, did have the consents of a majority of the employees to represent them; and that the withdrawal of those consents was due to the unjustified failure of the respondent to discuss with the union its request to bargain, to the belief, however erroneous, of many of the employees that there was more than mere coincidence in the shutting down of the plant following the unionization, and to the act of Mullins in going about with King to get the signatures against the union to a paper designated by some as a "back to work" petition.

It must be remembered that this is not a criminal case in which the charges of the Board must be established beyond a reasonable doubt or a case in which the evidence must all be direct. Neither is it one in which Board or Court must shut its eyes to the cogent circumstances supporting the Board's finding that there was an unlawful refusal to bargain and unlawful interference with the organizational and bargaining rights of the employees, with the result that the union lost its majority status.

In these circumstances, the rule first announced in this circuit under the Railway Labor Act, 45 U.S.C.A. § 151 et seq., in the Railway Clerks' case,[1] and adopted in Sec. 10(c) of the National Labor Relations Act, 29 U.S.C.A. § 160(c), see National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, at 267 and 268, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307, has peculiar applica-

[1] Brotherhood of Ry. & Steamship Clerks v. Texas & N. O. R. Co., D.C., 24 F.2d 426; Id., D.C., 25 F.2d 873, affirmed Texas & N. O. R. Co. v. Ry. Clerks, 5 Cir., 33 F.2d 13, Id., 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034.

tion. This court, in N. L. R. B. v. Riverside Mfg. Co., 5 Cir., 119 F.2d 302, applied this rule to a similar situation, and it has been uniformly held since [2] that it is within the province of the Board to order restoration of the status quo by restoring the union to its position as bargaining agent, even though, as a result of the prohibited action by the employer, the union has lost its majority status.

Since, however, the evidence in this case leaves in no doubt that the authorizations on which the union relies did not represent the thoughtful and deliberate action of the employees but were the results of a rush act, a "whirlwind campaign", as it is called, and the counter-signatures, though characterized by the same rush methods, did express complete opposition to representation by the union, we here make it clear, as we did in the Railway Clerks and the Riverside Mfg. Co. cases, and as the Supreme Court did in the Franks case, that the order requiring the employer to bargain with the union is not intended to force a permanent bargaining relationship. It is intended to do no more than reestablish the status quo of July 22nd, as a basis for action until, and only until, the employees have had an opportunity, with the assistance of the Board, and without coercion or interference from union or employer, to determine whether they want the union to continue to represent them as bargaining agent. In the event they should determine that they do not wish it to represent them as bargaining agent, our order shall not require respondent to recognize or treat with it as such.

In order, therefore, that the purpose of the statute, to protect the rights of employees, not the rights of the union or the employer, may not be defeated but given full effect, the order of the Board will be amended, as was done in the Riverside case, to so provide, and, as amended, will be enforced.

[2] Franks Bros. Co. v. N. L. R. B., 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020.