**NATIONAL LABOR RELATIONS BOARD**
v.
**PARMA WATER LIFTER CO.**
No. 13770.

United States Court of Appeals
Ninth Circuit.
March 8, 1954.

Rehearing Denied April 13, 1954.

George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Marcel Mallet-Prevost, Edmond F. Rovner, Washington, D. C., Melton Boyd,

Attys., N.L.R.B., Seattle, Wash., for petitioner.

Eli A. Weston, Boise, Idaho, for respondent.

Before STEPHENS, BONE and ORR, Circuit Judges.

BONE, Circuit Judge.

This case is before us on the petition of the National Labor Relations Board for enforcement of an order which it has issued against respondent. The order was based upon findings that respondent violated Section 8(a) (1) and (5) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 158(a) (1, 5), by refusing to bargain with International Association of Machinists, Local Lodge No. 1491 (herein "the Union") after a majority of the employees had designated the Union as their bargaining representative; and that respondent interfered with, restrained and coerced its employees in the exercise of the rights guaranteed in Section 7 of the Act, 29 U.S.C.A. § 157, in violation of Section 8(a) (1) of the Act, by making threats against and promises to the employees and engaging in other acts designed to dissuade them from adherence to the Union and to interfere with their right of collective bargaining. In its decision the Board adopted in full the findings and conclusions of the Trial Examiner. Its order requires respondent to cease and desist from the unfair labor practices found, to bargain with the Union on request, and to post the usual notices.

### The Union's Majority

Respondent manufactures farm and industrial machinery at its plant in Parma, Idaho. On February 3, 1952, 15 of respondent's 19 production and maintenance employees who, concededly, constitute an appropriate bargaining unit, signed Union authorization cards. On the evening of February 4 a meeting was held at the home of one of the employees. Respondent's production manager, Lee Rose, and a foreman, Joe Gilmore, attended the meeting. At the meeting a secret ballot was taken and the employees present selected the Union as their bargaining representative by a vote of 14 to 1.

On the basis of the above undisputed facts the Board concluded that the Union was duly designated as the bargaining representative of the employees. Respondent attacks this finding on several grounds. Respondent first contends that since Wayne Morris, one of the employees who was active in the Union's organizational drive, was a "supervisor" within the meaning of Sec. 2(11) of the Act,[1] his Union activity constituted management interference with or coercion of the employees in choosing the Union as bargaining agent, with the result that the Union did not have an "uncoerced majority" of the employees.

We pass the question whether a supervisor's union activity can with sense be deemed employer interference with the employees' organizational efforts when, as in the instant case, such activity is carried on in the face of strong and quite open Union hostility on the part of the supervisor's superiors. On first impression it would seem that the supervisor acts as the antagonist and not as representative of the employer in such circumstances. However, the Board met respondent's contention with a finding that Morris was not a "supervisor" and it is upon that finding that petitioner here relies. We shall therefore confine our attention to that question.

---

1. "Sec. 2. When used in this Act
   *    *    *    *    *

   "(11) The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." 29 U.S.C.A. § 152(11).

Morris worked in the lathe shop with one other machinist and an apprentice. The lathe shop was under the direct supervision of Manager Rose. Morris testified that it was his "understanding" that in the absence of Rose he was in charge of the lathe shop; that he sometimes assigned work to the other two employees in the shop, but that often the work was turned over to them without his intervention; that Rose or respondent's president, Lloyd Nelson disciplined the workers in the shop; that he (Morris) did not discipline the other two men, and did not know if he had authority to do so; that he did not and could not hire, fire or promote employees or recommend such action. There was evidence that Morris's authority to "assign" work was exercised by suggestions to the other two men to do certain tasks when necessary to get work out on time. The other two employees often made similar suggestions to Morris. Morris did not consider himself a supervisor, and neither did the other two employees who worked with him. Morris never participated in meetings of supervisory personnel or attended policy-making conferences at the plant.

▆ Morris's status was about the same as that of the employee Tancrell in the case of N. L. R. B. v. Whitin Machine Works, 1 Cir., 204 F.2d 883, and involved less responsibility than that held by the "room boss" or "leadman," Petti, in the case of Precision Fabricators v. N. L. R. B., 2 Cir., 204 F.2d 567, both of whom were held not to be "supervisors" within the meaning of Sec. 2(11) of the Act. He did the work of an ordinary production employee and had no authority to direct work when Manager Rose was present. Cf. N. L. R. B. v. Quincy Steel Casting Co., 1 Cir., 200 F.2d 293, 296. And the exercise of the limited authority he had in Rose's absence appears to have been of a "merely routine or clerical nature," not requiring the "use of independent judgment." Sec. 2(11) of the Act; cf. N. L. R. B. v. Whitin Machine Works, supra, 204 F.2d at page 886; Precision Fab-

ricators v. N. L. R. B., supra. We think the Board did not err in finding that Morris was not a "supervisor" within the meaning of Sec. 2(11) of the Act.

▆ Respondent next contends that the Union secured its majority by "pressure," and "persuasion or coercion or unreasonable promises," but there is not a shred of evidence to support the contention. Finally, it seems to be urged that a Union is entitled to recognition as bargaining representative only after a Board-conducted representation election. It is well settled, however, that the designation may be made by other means, one of the most common of which is the signing of Union authorization cards. N. L .R. B. v. Trimfit of California, Inc., 9 Cir., 211 F.2d 206; N. L. R. B. v. W. T. Grant Co., 9 Cir., 199 F.2d 711–712; Zall v. N. L. R. B., 9 Cir., 202 F.2d 499, 501; Motorola, Inc. v. N. L. R. B., 9 Cir., 199 F.2d 82, 83. In this case there was, in addition to the signing of the authorization cards, the informal poll of the employees on the evening of February 4, 1952, in which a majority of the employees voted for the Union as bargaining agent. We find no error in the Board's finding that the Union was effectively designated as the bargaining representative of the employees.

### The Unfair Labor Practices

The facts with respect to the alleged unfair labor practices of respondent, as found by the Board on the basis of substantial evidence, were as follows. As noted above, Rose and Gilmore, respondent's production manager and foreman, respectively, attended the meeting on February 4, at which 14 of the employees voted for the Union as their bargaining agent. In respondent's plant the next day, February 5, Rose told one of the employees that President Nelson was willing to grant a pay raise if the employees would "drop this Union thing," and that "before he [Nelson] will sign the Union contract he will sell the shop and go out of business." Rose told another employee to throw away his Union button. Gilmore stated to an em-

ployee that Nelson was angry and had threatened to sell the plant. A petition was circulated among the employees. Rose dictated the heading of the petition, which read: "We the undersigned wish to be released from all association with the IAM Union." As the petition was being circulated, Rose told one employee that "If [your] job means anything to [you] go through and sign" the petition. One of the employees testified that he signed the petition because he had heard that the plant would be closed if the Union was successful, and that a wage raise would be granted if the Union was defeated. Eleven of the 19 employees signed the petition.

On the same day, February 5, the Union sent, and respondent received, a registered letter giving notice that the Union represented the employees and requesting a bargaining conference. On February 8, without consulting the Union, respondent posted a notice in the plant that the work-week was being reduced from 44 to 40 hours. The following day, February 9, Nelson replied to the Union's request for a bargaining conference. In his letter Nelson stated that his attorney had received the February 5 withdrawal petition signed by 11 employees, and that in view thereof he did not believe the Union represented the employees. Nelson added that he would agree to an election to determine the question of representation. A week later, on February 16, Nelson, without consulting the Union, announced a wage increase of from 10 to 26 cents an hour. The Union filed unfair labor practice charges with the Board on February 27.

■ These facts support the Board's conclusions that respondent violated Secs. 8(a) (1) and 8(a) (5) of the Act. The July 5 threats against the employees that they would be discharged for adherence to the Union, and that the plant would be sold if the Union was successful; the promise of wage increases if the Union was defeated; the telling of an employee to remove his union button; the support by Manager Rose, simultaneously with the above activities, of the anti-Union petition in the plant—all plainly constituted interference with and coercion of the employees in the exercise of their rights, within the meaning of Sec. 8(a) (1) of the Act.[2] Respondent points to evidence that a sale of the plant and the wage increases were contemplated prior to the above incidents, but even if that were so, it did not justify respondent in making the anticipated events the subjects of threats and allurements to force abandonment of the Union by the employees.

■ Also violative of Sec. 8(a) (1) of the Act, as the Board found, were respondent's unilateral actions in cutting the length of the work-week on February 8 and granting a wage increase on February 16. Again respondent argues that the Union activity had nothing to do with the wage increase. It does appear that, shortly prior to the advent of the Union, respondent was engaged in an attempt to clear a wage raise with the Office of Price Stabilization, and Rose and Nelson testified that the decision was made before the Union made its appearance to grant a pay increase effective the first week of February. But the employees were unaware of the decision. And if such decision was in fact made, other actions of respondent are hard to explain. The employee Lyall testified that on February 1 he told Rose he would have to receive a pay raise if

2. Threats to sell plant: N. L. R. B. v. L. Ronney & Sons Furniture Mfg. Co., 9 Cir., 206 F.2d 730; N. L. R. B. v. State Center Warehouse & Cold Storage Co., 9 Cir., 193 F.2d 156. Threats of discharge: N. L. R. B. v. State Center Warehouse & Cold Storage Co., supra. Promise of wage increases: Medo Photo Supply Corp. v. National Labor Relations Board, 321 U.S. 678, 684, 64 S.Ct. 830, 88 L.Ed. 1007; N. L. R. B. v. Howell Chevrolet Co., 9 Cir., 204 F.2d 79, 83, 84, affirmed on other points 346 U.S. 482, 74 S.Ct. 214. Directing employee to remove union button: N. L. R. B. v. W. T. Grant Co., 9 Cir., 199 F.2d 711, 712. Supporting petition withdrawing from membership in union: N. L. R. B. v. Lovvorn, 5 Cir., 172 F.2d 293, 294.

he was to continue on his job, and that he was summarily told by Rose that he could go and get his pay check. Another employee was refused a wage increase in January without explanation. Having in mind respondent's obvious hostility to the Union and its vigorous efforts to defeat it shortly prior to the granting of the wage increase, we think the Board was justified in concluding that the increase in pay was motivated by a purpose to dissuade the employees from their adherence to the Union. Cf. Motorola, Inc. v. N. L. R. B., 9 Cir., 199 F.2d 82. But even if, as respondent contends, the wage increase was induced by other than anti-Union motives, it was nonetheless prohibited by Sec. 8(a) (1) of the Act because, as will be pointed out shortly, the action was taken at a time when respondent was subject to the statutory duty to bargain with the Union, and after the Union had requested a bargaining conference. The granting of the wage increase and cutting of the work-week, without consulting the Union as the employees' bargaining representative, were "subversive of the mode of collective bargaining which the statute has ordained," and were therefore violations of Sec. 8(a) (1) of the Act. Medo Photo Supply Corp. v. National Labor Relations Board, 321 U.S. 678, 687, 64 S.Ct. 830; May Department Stores Co. v. N. L. R. B., 326 U.S. 376, 66 S.Ct. 203, 90 L.Ed. 145; Zall v. N. L. R. B., supra.

Respondent concedes its refusal on February 9 to bargain with the Union. It is again urged, however, that respondent was not obligated to bargain with the Union until the question of representation was determined in a Board-conducted election. As we have already stated, the Board was justified in concluding that the Union was effectively designated as the bargaining representative of the employees by the signing of the Union authorization cards on February 3. We are mindful that an employer is not required to bargain with a Union when he has a good faith doubt of the Union's representative status.

But there is no evidence that on February 5 respondent had any doubt of the Union's majority. Respondent was aware on that day of the employees' choice of the Union as bargaining agent, for Manager Rose and Foreman Gilmore had been present at the meeting on February 4 when 14 of the employees voted to authorize the Union to bargain in their behalf. On February 5 respondent engaged in the unlawful anti-Union activities described above. The result of those activities was the withdrawal petition signed by 11 of the employees. It was solely on the basis of that petition that respondent, in its February 9 reply to the Union's request for a bargaining conference, challenged the Union's representative status. That petition furnished no ground for a refusal to bargain with the Union. "Petitioner [the employer] cannot, as a justification for its refusal to bargain with the Union, set up the defection of union members which it had induced by unfair labor practices, even though the result was that the Union no longer had the support of a majority. It cannot thus, by its own action, disestablish the Union as the bargaining representative of the employees, previously designated as such of their own free will. [Omitting citations] Petitioner's refusal to bargain under those circumstances was but an aggravation of its unfair labor practice in destroying the majority's support of the Union, and was a violation of Sec. 8(1) and (5) of the Act [now Secs. 8 (a) (1) and 8(a) (5) of the Act]." Medo Photo Supply Corp. v. National Labor Relations Board, 321 U.S. 678, 687, 64 S.Ct. 830.

Respondent suggested an election in its letter to the Union of February 9 and contends that such an election should then have been held. But as we recently had occasion to remark, in answer to a similar contention, "Respondent [the employer] is hardly in a position to complain about the union's refusal to consent to an election when respondent's own unfair labor practice

·rendered a free election impossible." National Labor Relations Board v. Trimfit of California, Inc., 9 Cir., 206 F.2d 211.

The Board's order will be enforced.