**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**FLOMATIC CORPORATION, Respondent.**

No. 352, Docket 29288.

United States Court of Appeals Second Circuit.

Argued April 19, 1965.

Decided June 14, 1965.

Nancy M. Sherman, N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and

31. Compare Fed.Rule Civ.Proc. 15(b).

Allen M. Hutter, Atty., N. L. R. B., on the brief), for petitioner.

Robert H. Jones, III, Albany, N. Y. (Thomas P. Connolly, Albany, N. Y., on the brief), for respondent.

Before KAUFMAN, HAYS and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

This is a petition by the National Labor Relations Board to enforce its order of June 30, 1964 against respondent Flomatic Corporation. The order directs Flomatic to cease and desist from violating Section 8(a) (1) of the National Labor Relations Act, as amended, 29 U.S.C. § 151 et seq. and, upon request by the union, to bargain collectively with Lodge No. 1588, International Association of Machinists, AFL–CIO as the exclusive representative of the production and maintenance employees at respondent's Hoosick Falls, New York plant. In addition, the order requires the posting of appropriate notices.

Respondent is a New York corporation engaged in the manufacture, sale and distribution of valves and related products. On March 25, 1963 it had twenty-eight production and maintenance employees, of whom twenty had signed cards authorizing Lodge No. 1588 of the IAM to negotiate and conclude agreements on their behalf relating to wages, hours and other conditions of employment. On March 26 Flomatic received a letter from William H. Bradt, Lodge No. 1588 representative, which stated that the union had obtained a card majority of the production and maintenance employees which authorized it to represent them in all matters pertaining to collective bargaining. The letter demanded recognition of the union as the exclusive bargaining representative and requested an appointment with company officials. Before any meeting could be held, the union filed a petition with the Board to be certified as the exclusive bargaining representative.

On April 1, Bradt met with Wilbur C. Rice, president and plant manager of Flomatic. Bradt did not request that Flomatic recognize Lodge No. 1588 and did not offer the designation cards for count or verification. Their discussion went primarily to representation election procedures. Rice told Bradt that if the employees wanted a union he would be glad to work with one, although he did not feel that a union was necessary at Flomatic. As evidence of his personal willingness to cooperate with unions, he showed Bradt a copy of a letter from the United Steelworkers Union commending him for his labor relations work at another company where he had been employed.

Rice met with his employees individually and collectively on several occasions during the month of April. On May 1, the day before the election, the union distributed a leaflet to the employees urging them to vote for the union and listing various subjects about which the union would require the company to bargain if it won the election. The leaflet went on to say that it was fair to infer not only that pay rates and substandard conditions would not be improved, but would be lowered even further unless the union won. On the afternoon of that day and up to a minute before the polls opened, Rice distributed a letter in reply to this leaflet, and covered a variety of subjects of interest to the employees. He concluded his letter by urging the employees to vote against the union.

The union lost the election 19 to 7. On May 8 the union filed objections to the election, alleging *inter alia* that Rice's letter had destroyed the employee's right to a free election. A few days later the company and the union stipulated that the election be set aside. On May 21 the Regional Director set aside the election and directed a new election at a time to be fixed by him. However, on May 23 the union requested permission to withdraw its petition for a new election, on the ground that the company's unfair labor practices had dissipated the union's majority. Permission was granted, and on June 10, the union filed its unfair labor practice charges.

The Board held that Respondent did not violate § 8(a) (5), which makes it an unfair labor practice to refuse to bargain collectively with the employees' representatives, because the union's letter demanding recognition did not include a clear and unequivocal demand for bargaining but rather was asking only for an election, as a means of establishing its status as the bargaining representative of the employees. Under the circumstances, the Board held that Respondent was justified in not regarding the union's letter as a specific request to bargain such as to call for a response, and that Rice's April pre-election conduct did not violate that provision of the Act. It reversed the Trial Examiner, however, by finding that Rice's letter of May 1 contained promises of benefits and invitations to employees to bypass the union and to deal directly with Respondent, which interfered with the employees' exercise of § 7 rights, in violation of § 8(a) (1), and which destroyed the conditions for a fair election in which the union could demonstrate its majority. As an appropriate remedy, the Board entered a bargaining order. The Board's decision is reported at 147 NLRB No. 143 (1964).

Two questions are, therefore, presented: (1) whether there is substantial evidence to support the Board's finding that the company violated § 8(a) (1) by interfering with, restraining or coercing its employees in the exercise of their right to self-organization, and, if this is so, then (2) whether a bargaining order is an appropriate remedy for the unfair labor practice found.

### The Unfair Labor Practice

■ Although the trial examiner reached a contrary conclusion, we cannot say on the record as a whole that there was not substantial evidence to support the Board's decision that Flomatic violated § 8(a) (1). Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). While Rice, in his letter of May 1, 1963, stated that with an N. L. R. B. election

in the offing it would not be legal for him to make any guarantees of what improvements he would offer, the letter did contain promises of benefit as well as invitations to the employees to deal directly with the company. Included in the employer's promises were a wage raise ("I have previously said I would consider pay raises as soon as we were making money * * * [We] did make money in the past quarter of this year, so if my word is any good you can draw your own conclusions."), seniority ("I will guarantee to respect seniority."), vacation with pay ("I would hope that we could look for some improvement in the vacation benefits for employees with many years of seniority."), arbitration ("If many of you think it would be desirable to establish such a procedure, I would be very glad to work on it with you."), lay-off and recall ("I will be glad to guarantee that lay-offs and recall will be based on seniority."), paid holidays ("If more than six paid holidays becomes more or less standard throughout industry, we shall certainly join the crowd."), profit sharing ("I will work towards instituting [such a plan]."), pensions ("At the moment, of course, Flomatic Corporation cannot afford a pension plan and you can be sure that I am doing my best to alter this situation."), leave of absence ("[Y]ou may assume the policy of granting a leave is now in effect at Flomatic."), grievance procedure ("I will do my best to see that [any] grievance is resolved to your satisfaction as quickly as possible."). And at the outset of the letter Rice stated his case for dealing with the company directly:

"In a company of this size it hardly seems necessary to pay dues to a union for the privilege of talking to me * * * An exchange of views through a third party is never satisfactory and is often distorted and misunderstood. A direct communication between two people is almost always the best way to solve a problem. If you don't want to come to me I shall be glad to come to you at

your convenience to discuss any matter which you think we should look into."

The letter was more than a statement of pre-existing policy or reply to the union's circular. It went beyond a statement of current labor policy, because it carried thinly-veiled promises of benefit that even the most naive employee could easily read as contingent upon the defeat of the union, and it was only partially justified as a response to the union's campaign promises and the charge that, without a union, wages would be lowered. Such an argument must take into consideration the fundamental difference between a union's election promises and those of an employer. A union can effectively promise only that it will try to gain certain benefits in bargaining sessions. In contrast, an employer appears as one who can fulfill any pledges he makes which seem to be reasonably within his means. The differing nature of these promises is not likely to be overlooked by the employees in deciding how to cast their ballots. To treat Rice's letter on the same footing with the union circular would run counter to the broad purpose of § 8(a) (1), which is to establish the right of employees to organize for their mutual aid without employer interference. Republic Aviation Corp. v. N. L. R. B., 324 U.S. 793, 798, 65 S.Ct. 982, 89 L.Ed. 1372 (1945). No question of free speech is involved. Section 8(c), by which Congress in 1947 embodied in the Act its understanding of the First Amendment's requirements, specifically denies protection to speech containing a "promise of benefit," such as the Board found here.

Thus there was sufficient evidence on which the Board could find that Flomatic committed an unfair labor practice within the meaning of § 8(a) (1), and its finding is, therefore, conclusive. N. L. R. B. v. Exchange Parts Co., 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964); N. L. R. B. v. Philamon Laboratories, Inc., 298 F.2d 176, 180–181 (2d Cir.), cert. denied 370 U.S. 919, 82 S.Ct. 1555, 8 L.Ed.2d 498 (1962); N. L. R. B. v.

Pyne Molding Corp., 226 F.2d 818, 820 (2d Cir. 1955); Indiana Metal Products Corp. v. N. L. R. B., 202 F.2d 613, 620 (7th Cir. 1953); see Medo Photo Supply Corp. v. N. L. R. B., 321 U.S. 678, 686, 64 S.Ct. 830, 88 L.Ed. 1007 (1944).

### The Board's Remedy

Flomatic objects to that part of the Board's order which requires the company to bargain with the union on request. It contends that the facts of this case warrant only a cease and desist order and a new election.

Under § 10(c) the Board is empowered to take such affirmative remedial action as will effectuate the policies of the Act. It is well settled that the Board has a great deal of discretion in devising appropriate remedies for unfair labor practices. Franks Bros. Co. v. N. L. R. B., 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1944); Phelps Dodge Corp. v. N. L. R. B., 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271 (1941); N. L. R. B. v. Stow Manufacturing Co., 217 F.2d 900, 905 (2d Cir. 1954), cert. denied 348 U.S. 964, 75 S.Ct. 524, 99 L.Ed. 751 (1955). However, the Board's action is not insulated from judicial review where it has applied "a remedy it has worked out on the basis of its experience, without regard to circumstances which may make its application to a particular situation oppressive and therefore not calculated to effectuate a policy of the Act." N. L. R. B. v. Seven-Up Bottling Co., 344 U.S. 344, 349, 73 S.Ct. 287, 290, 97 L.Ed. 377 (1953); see also, Local 60, United Bhd. of Carpenters, etc. v. N. L. R. B., 365 U.S. 651, 81 S.Ct. 875, 6 L.Ed.2d 1 (1961); Consolidated Edison Co., etc. v. N. L. R. B., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938).

The Board's affirmative order is premised on the view that Lodge No. 1588 had a majority prior to the unfair labor practice and would have won the election but for the May 1–2 letter. Therefore, according to the Board, a bargaining order is appropriate to restore the situation as nearly as possible to that

which would have obtained but for the unfair labor practice, the effects of which might carry over to vitiate any later election.

A bargaining order, however, is strong medicine. While it is designed to deprive employers of a "chance to profit from a stubborn refusal to abide by the law," Franks Bros. Co. v. N. L. R. B., supra, 321 U.S. at 705, 64 S.Ct. at 819, and although it undoubtedly operates to deter employers from adopting illegal intrusive election tactics, its potentially adverse effect on the employees' § 7 rights must not be overlooked. See Medo Photo Supply Corp. v. N. L. R. B., supra, 321 U.S. at 688, 697–698, 64 S.Ct. at 835, 839–840 (Rutledge, J. dissent). That section protects the right of employees to join or refrain from joining labor organizations. And that right is implemented by § 9(c) (1) which provides for representation elections by secret ballot. Since a bargaining order dispenses with the necessity of a prior secret election, there is a possibility that the imposition of such an order may unnecessarily undermine the freedom of choice that Congress wanted to guarantee to the employees, and thus frustrate rather than effectuate the policies of the Act.

The facts of this case provide an illustration. The Board's disagreement with its own Trial Examiner on the purport and effect of Rice's letter certainly compels the conclusion that we are not presented with a flagrant violation of the Act. There was no aggressive or planned campaign aimed at dissipating union strength by resort to threats, discharges or refusals of recognition. On the contrary, the Board found that the employer was never asked to bargain, and there was evidence that he even expressed a willingness to do so if the employees wanted union representation. Yet the Board justifies its order on the ground that the violation here destroyed the conditions for a fair election in which the union could demonstrate its majority. But the only evidence of the union's majority status is the fact that

twenty of the twenty-eight employees signed authorization cards a month before the election. Such cards, by the Board's own admission, are a "notoriously unreliable method of determining majority status of a union * * * " Sunbeam Corp., 99 N. L. R. B. 546, 550–51 (1952); Midwest Piping and Supply Co., Inc., 63 N. L. R. B. 1060 (1945). While these cases involved cards signed during rival organizing campaigns of competing unions, the Board's assessment of the significance of the cards cannot logically be said to have no bearing where the issue is between an employer and a union; moreover it is beyond dispute that secret election is a more accurate reflection of the employees' true desires than a check of authorization cards collected at the behest of a union organizer. See N. L. R. B. v. Hannaford Bros. Co., 261 F.2d 638, 641 (1st Cir. 1958); see also, AFL–CIO, Guidebook for Union Organizers 10, Sept. 1961.

This is not to say that the Board may never base a bargaining order as restorative of the status quo on card majorities. Indeed one court enforced such an order, while observing " * * * the authorizations on which the union relies did not represent the thoughtful and deliberate action of the employees but were the results of a rash act * * *." N. L. R. B. v. Lovvorn, 172 F.2d 293, 295 (5th Cir. 1949). Such card majorities must by necessity be deemed evidence of the status quo ante where the employer's conduct has been so flagrantly hostile to the organizing efforts of a union that a secret election has undoubtedly been corrupted as a result of the employer's militant opposition.

Where, as here, there was no such sustained broad-guaged campaign but only the instance of a somewhat overstated reply to the union's charge, a bargaining order based on authorization cards in lieu of a secret election is less easily justified. Thus, an eminent commentator has advocated restricting the order to bargain to cases involving such serious violations as discriminatory dis-

charges or clear threats of retaliation. He argues that given the lingering effects of aggravated unfair practices, a bargaining order may provide the best means of giving effect to the employees' real wishes, but in limiting the remedy to cases of serious violations, the Board could offer a "better case for the benefit of those who remain troubled by the effect of a bargaining order on the rights of the employees." Bok, The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act, 78 Harv.L.Rev. 38, 138 (1964).

Similarly, the courts have implicitly recognized that the bargaining order remedy should be applied with restraint, and accordingly have enforced such orders in cases of §§ 8(a) (2), 8(a) (3) and 8(a) (5) violations, some of which were coupled with or included § 8(a) (1) transgressions. Local No. 152, International Bhd. of Teamsters v. N. L. R. B., 343 F.2d 307 (D.C.Cir., Jan. 28, 1965); N. L. R. B. v. Philamon Laboratories, Inc., supra; Piasecki Aircraft Corp. v. N. L. R. B., 280 F.2d 575 (3rd Cir. 1960), cert. denied 364 U.S. 933, 81 S.Ct. 380, 5 L.Ed.2d 365 (1961); Editorial "El Imparcial", Inc. v. N. L. R. B., 278 F.2d 184 (1st Cir. 1960); Summit Mining Corp v. N. L. R. B., 260 F.2d 894 (3rd Cir. 1958); N. L. R. B. v. Stow Manufacturing Co., supra; N. L. R. B. v. Caldarera, 209 F.2d 265 (8th Cir. 1954); D. H. Holmes Co., Ltd. v. N. L. R. B., 179 F.2d 876 (5th Cir. 1950); Texarkana Bus Co. v. N. L. R. B., 119 F.2d 480 (8th Cir. 1941). Those cases involved more glaring violations than the one found here, and where as in § 8(a) (5), an employer has refused to bargain, under circumstances in which he was under a duty to do so because the union enjoyed the status of exclusive bargaining agent, the remedy may be thought uniquely appropriate. No court, however, has held that a borderline, unaggravated § 8(a) (1) violation, standing alone, occurring prior to an election, warranted a bargaining order.

The argument for restraint seems even more compelling since the Board's decision in Bernel Foam Products Co., Inc., 146 NLRB No. 161 (1964). There the Board overruled Aiello Dairy Farms, 110 NLRB 1365 (1954), which required a union, upon knowledge of the pre-election unfair labor practice, to elect whether to participate in a Board-conducted election or to file a § 8(a) (5) charge. The Board had found, after ten years of experience, that the requirement for an election of remedies did not produce the saving in time and money in administering the Act that was expected. The Board's decision lies within the scope of its statutory power, is rationally supported, and hence is not an abuse of administrative discretion. See Seven-Up Bottling Co., supra, 344 U.S. at 348–349, 73 S.Ct. 287. Furthermore, Flomatic is not in a position to complain of the retroactive application of the Bernel Foam rule, since it made no showing of any justifiable reliance on the old rule. Cf. Pedersen v. N. L. R. B., 234 F.2d 417 (2d Cir. 1956). But even though the waiver rule may not be invoked here, the effect, on future similar cases, of the application of Bernel Foam in conjunction with an affirmative order to bargain should be contemplated. Hereafter, even though there is only a very slight basis for doing so, a union will take care to raise an unfair labor practice charge along with petitioning for an election. If the union should win the election, all would be well. If it lost, it would then press the unfair labor practice charge, and, following its decision in this case, the Board would be empowered to order bargaining even if the violation were minimal. Thus the union could become the exclusive bargaining agent regardless of whether it prevailed in the secret election. In cases of this kind the granting of such an advantage to the union would create an unwarranted lim-

itation on the employees' freedom of choice.

The Board argues that the effect of its order need not be that dire. It emphasizes that the affirmative order, unlike a certification, does not require Flomatic to bargain with the union for at least a year without regard to its *de facto* majority status, and it does not give the union either the same right to impose picketing pressure or the same protection against pressure by rival unions. But if the union is permitted for some time to continue as the bargaining representative—more than two years after obtaining a card majority—this may vitiate the employees' freedom of choice in any subsequent election much more than Rice's letter of May 1, 1963 which may have been long since forgotten. We do not hold that the Board can never issue a bargaining order in an 8(a) (1) case but where there is at most a moderate unbalancing of an election by an employer such as there was in this case, there is no adequate justification for putting the union in a position to unbalance it the other way to an extreme degree.

A more appropriate remedy for the unfair labor practice found in this case would be an order requiring the employer to cease and desist from any further violations of § 8(a) (1) and directing a new election after a reasonable passage of time and an opportunity for further persuasion by the union.

Enforcement is granted as to that part of the Board's order which requires the employer to cease and desist from interfering, with restraining or coercing its employees with regard to their representation by a labor organization. Enforcement is denied as to the bargaining order and the Board is directed to conduct a new election.

HAYS, Circuit Judge (concurring in part and dissenting in part).

I concur with my brethren in support of the Board's finding of a violation of Section 8(a) (1), and I concur in Judge Anderson's opinion insofar as it deals with that issue. I dissent from the Court's refusal to enforce the Board's order to bargain.

The Board found "on the basis of the particular circumstances [of this case] that the Respondent was justified in not regarding the Union's letter as a specific request to bargain." Thus in refusing to enforce the remedy devised by the Board, the Court gives great weight to the technicality that the union petitioned for an election without waiting for a reply to its letter to the employer asking for recognition. If the union had waited for a reply, the employer would have been required to bargain, there being no good faith doubt as to representation. The Court would then have accepted the Board's bargaining order as entirely proper.

Much of the Court's reliance is based upon the argument that the employer did not interfere *very much* with the election. I would have thought that a judgment as to the extent of such interference was peculiarly within the area of the Board's expertise. On April 1 and April 23 the employer held meetings of all his employees at which he urged them not to join the union. On April 26 and May 2 he sent them letters to the same effect. The letter of May 2 the employer personally distributed up to a minute before the polls closed. Of this letter the Board said:

"[I]t contained a series of promises of benefit and invitations to employees to deal directly with the Respondent that dissipated the majority status of the Union and destroyed the conditions for a fair election in which the Union could demonstrate its majority."

The evidence shows that a majority for the Union of at least 20 to 8 was changed

to a majority against the Union of 19 to 7.

The Court refers to the employer's interference with the employees' election as "at most a moderate unbalancing of an election." (Just how many votes must you interfere with in order to achieve an immoderate unbalancing of an election?) Putting the Union in the position to which it was entitled before the employer's interference, the Court calls putting it "in a position to unbalance [the election] the other way to an extreme degree." What the Court appears to be saying is that to provide employees with bargaining representatives is to exercise extreme influence on their choice (i. e., in favor of those representatives), while to leave them to deal unrepresented with the employer is only to influence them moderately. I can only repeat that it seems to me that all this balancing of various factors is peculiarly the duty of the Board.

Finally, though the Court's order would appear to direct an immediate election, surely the Court is going to leave to the Board at least the determination of the time when the election should take place. That time should be the earliest date at which it may fairly be said that the effects of the employer's unfair labor practices have been dissipated. If we enforced the Board's order the election would take place when the employer was in compliance with the order. Armco Drainage & Metal Prods., Inc., 116 N.L.R.B. 1260 (1956); Squirrel Brand Co., 104 N.L.R.B. 289 (1953); Brooks v. N. L. R. B., 348 U.S. 96, 101 n. 9, 75 S.Ct. 176, 99 L.Ed. 125 (1954) (dictum). I do not see that there is any advantage in this difference to anyone but the employer, who, by reason of the Court's decision, is able to accomplish exactly what he originally set out to accomplish, i. e., to postpone the date when he must deal with the employees through their chosen representatives, or to see to it that that date never comes.