**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**The BIN–DICATOR COMPANY, Respondent.**

**No. 15760.**

United States Court of Appeals Sixth Circuit.

Feb. 14, 1966.

Leo N. McGuire, N. L. R. B., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Elliott Moore, Atty., N. L. R. B., Washington, D. C., on the brief), for petitioner.

Paul Franseth, Detroit, Mich. (Long, Ryan, Franseth & Spicer, Detroit, Mich., on the brief), for respondent.

Before MILLER * and O'SULLIVAN, Circuit Judges, and KENT, District Judge.

O'SULLIVAN, Circuit Judge.

This matter is before us upon the petition of the National Labor Relations Board for enforcement of its order of July 31, 1963, which is based on its finding that respondent, The Bin-Dicator Company, was guilty of violating Sections 8(a) (1) and (3) of the National Labor Relations Act, 29 U.S.C.A. § 158 (a) (1) and (3). The Board's Decision and Order with its Examiner's Intermediate Report are reported as The Bin-Dicator Company, 143 N.L.R.B. 964 (1963). The Board found that respondent violated the Act by interrogation of and threats to its employees during the course of an organizational campaign, by the discriminatory discharge of one employee, and by a reprimand and denial of a pay raise to another.

Respondent company has its office at Detroit and its manufacturing plant at Port Sanilac, Michigan. About April 1, 1962, employee Floyd Hanger contacted

---

* This case was argued to a panel of the Court consisting of Judges Miller, O'Sullivan and Kent. Judge Miller died before a decision was reached or an opinion prepared.

the Teamsters Union and pursuant to this, efforts were made to organize respondent's 18 eligible employees. Floyd Hanger and employee John Masinick were the leading protagonists for the union and it is a fair inference that their activities were known to respondent's supervision. By various questions, members of the supervisory staff intimated that they knew of union meetings that were being held. After one such meeting a supervisor said to Hanger, " * * * somebody is going to get hurt over this. That's why Rex Brinker was fired, for instigation and trouble making." Another employee was told that if the union got in, the company "could lock the doors and close the place down." A foreman told Hanger that, "Mr. Thurston [Assistant Plant Manager] told me to ask you [about the union] and he is mad, and somebody is going to get hurt," adding that the shop would close up and move out "and the guys would be out of a job." Shortly before a scheduled election, the plant manager told Hanger, who had returned from a vacation, that things had been peaceful while Hanger was away and "I want you to stay away from the employees." There was evidence that the assistant plant manager told Masinick that he had heard that Hanger and Masinick were the instigators of the union activity. A foreman told an employee that when he, the foreman, worked for Mueller Brass Co., the union got in and the employees lost their bonus. These various events occurred between April 1, 1962, and the holding of a representation election on June 28, 1962.

On June 11, 1962, the company and the union agreed to have the election. The election was held, and the union lost. On July 5, 1962, the Teamsters Union filed Objections to Conduct Affecting the Results of the Election, and sought to have it set aside. These objections charged the company with misconduct different from that relied upon in the NLRB complaint here involved. The Acting Regional Director found all of the objections without merit, and certified that no labor organization had gained bargaining rights for respondent's employees. Certification to that effect was made on August 17, 1962. Between then and September 12, 1962, there was no apparent union activity at respondent's plant.

On September 12, 1962, all of respondent's rank-and-file employees were called into the plant manager's office and a general ten cent an hour raise was announced. Employee Masinick, however, was excluded from the raise and was given a written reprimand reading as follows:

"Our attention has been called to failure on your part to follow directions of supervisor or cooperate in work assignments. A continuance in this direction will be grounds for termination of employment."

Also on September 12, 1962, Hanger was summoned to the office of plant manager Norman L. Grostick and was discharged. He was given the following letter:

"Notice of Discharge to Floyd Hanger:

"Repeated absence from work without notice after warnings and posted notice, and other failure to perform jobs as assigned."

An argument ensued between Hanger and Grostick, Hanger disputing the claim of absences from work without notice. Hanger, becoming infuriated, said to Grostick "This is a personal feud between you and me. I don't know when, but some day we are going to meet, and I am going to get you," and added "When I get you, you can expect to spend some time in a wheel chair." Hanger embellished this threat with the further observation, "You have witnesses here. I don't care what you do. You can call the state police, the sheriff, or anything else, but some day we will meet again." At this point, respondent's general foreman, Donald Sweet, entered and Hanger turned his attention to Sweet. He called Sweet "a toad, a son-of-a-bitch" and putting on some leather work mittens, the back of one of which was covered with metal staples, he made threatening ges-

tures to Sweet and "just kept raving and going on," inviting Sweet outside. He was finally quieted and left Grostick's office. Shortly afterward, while Sweet was going through the plant, Hanger picked up a six and a half pound casting and threatened to strike Sweet, implementing these gestures with further cursing. This time John Masinick intervened and took the casting from Hanger. Hanger then left the plant. The trial examiner made a finding of fact that Hanger had indulged in the above conduct.

On September 24 and November 19 of 1962, respectively, Hanger and Masinick filed charges against respondent—Hanger that he had been discriminatorily discharged, and Masinick that he had been denied a raise and given a reprimand, and both alleged that these deprivations were the consequence of their union activities. Each charge added that the described acts "and other acts not specifically set forth" interfered with the employees' rights guaranteed by Section 7 of the Act.

On November 28, 1962, the NLRB Regional Director consolidated the cases initiated by the above charges and issued a complaint which expanded the charges made by Hanger and Masinick by adding thereto a charge of violation of Sec. 8(a)(1) of the Act, arising from the company interrogation and alleged threats during April, May and June, 1962, preceding the election which the union lost. The Board's Trial Examiner sustained all of the charges of violation, recommended the usual cease and desist order, directed respondent to make Masinick whole for any loss from denying him the ten cent raise granted to the other employees, on September 12, 1962. However, because of the violent and threatening conduct of Hanger on the day of his discharge, the trial examiner declined to order his reinstatement with back pay. Upon review, the Board sustained its trial examiner in all respects except the denial of reinstatement of Hanger. Reversing, the Board said,

"In these circumstances, [unlawful discharge of Hanger] we find that Hanger's threats did not exceed the bounds of resentment which would normally be aroused in a moment of 'animal exuberance.'"

Respondent asks that we deny enforcement for the following reasons: *First,* that the statements made to Hanger, Masinick and other employees in April, May and June did not constitute unfair labor practice. *Second,* that procedurally such pre-election conduct should not have been considered because the charges filed by Hanger and Masinick had neither described nor relied upon such conduct as a violation, and because some of the pre-election conduct occurred more than six months before the complaint was issued and would be barred under Section 10(b) of the Act, 29 U.S.C.A. § 160(b). *Third,* that the finding of discriminatory discharge of Hanger, and discriminatory reprimand and denial of pay raise to Masinick were without substantial support in the evidence. *Fourth,* that there was neither charge, complaint, allegation or evidence that the September 12 general pay raise was motivated by antiunion purpose. *Fifth,* that, as found by the trial examiner, Hanger's post-discharge conduct disqualified him from reinstatement and back pay.

### I. *Pre-election interrogation and threats.*

The trial examiner, affirmed by the Board, found as a fact that the interrogation and threats as set out above were actually made by respondent's supervisors. We cannot say that such findings were without substantial evidentiary support "on the record considered as a whole" and we are, therefore, by Section 10(e) of the Act, precluded from disturbing them. 29 U.S.C.A. § 160(e). Universal Camera Co. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1950). It is further argued that the interrogations and other observations by respondent's supervisors were neither coercive nor designed or calculated to interfere with the employees' rights guaranteed by Sec. 7 of the Act. Whether they were of such illegal nature

was a matter of inference which, if validly made with evidentiary support, was within the exclusive province of the Board. N. L. R. B. v. Ford, 170 F.2d 735, 739 (CA 6, 1948); N. L. R. B. v. Link-Belt Co., 311 U.S. 584, 596–597, 85 S.Ct. 368, 85 L.Ed. 368 (1940); N. L. R. B. v. Nevada Consolidated Copper Corp., 316 U.S. 105, 62 S.Ct. 960, 86 L.Ed. 1305 (1941). We have held that interrogation of employees as to Union membership is not, per se, violative of Section 8(a) (1) of the Act, N. L. R. B. v. Tennessee Coach Co., 191 F.2d 546, 555 (CA 6, 1951); N. L. R. B. v. Flemingsburg Mfg. Co., 300 F.2d 182, 184 (CA 6, 1962), but may become so when viewed as part of a course of conduct which also included remarks that could be viewed as coercive. N. L. R. B. v. Nelson Mfg. Co., 326 F.2d 397, 398, 399 (CA 6, 1964); United Fireworks Mfg. Co. v. N. L. R. B., 252 F.2d 428, 430 (CA 6, 1958). Even though we might place a different construction on the remarks of respondent's people, we cannot say that the Board's inferences were without substantial evidentiary support.

## II. *Procedural faults.*

■ Even though the charges filed by Hanger and Masinick did not specifically rely on the pre-election conduct above discussed, such conduct was set forth in detail and claimed to be violative of the Act in the complaint issued by the Board's Regional Director. The complaint gave respondent adequate notice of the issues that were to be tried. The pre-election conduct could be encompassed by the allegation of "other acts" in the charges as made by Hanger and Masinick. We consider that what was done was procedurally permissible. N. L. R. B. v. Fant Milling Co., 360 U.S. 301, 307–308, 79 S.Ct. 1179, 3 L.Ed.2d 1243; Raser Tanning Co. v. N. L. R. B., 276 F.2d 80, 83 (CA 6, 1960), cert. denied, 363 U.S. 830, 80 S.Ct. 1601, 4 L.Ed.2d 1524; N. L. R. B. v. Kohler Co., 220 F.2d 3, 6, 7 (CA 7, 1955). Evidence of the pre-election conduct was relevant and germane to the events of September 12, 1962. Such events were the subject of the charges filed.

It is further urged that some of the pre-election conduct occurred longer than six months before November 19, when Masinick's charge was filed, and November 28 when the complaint was issued. It will be sufficient to say that at least some of the alleged threats and like conduct did occur in late May and in June, within six months of the filing of a charge by Masinick and the issuance of the complaint by the Board. If the only pre-election events relied upon all occurred prior to the six month limitation period, we would have a different question. We need not here consider it. In this case, evidence of those events was but background to the course of conduct which continued into the six month period.

## III. *Hanger and Masinick.*

Hanger's discharge and Masinick's reprimand with deprivation of the general pay raise, occurred in September after the union had, on June 28, lost the election and after the Regional Director had, on August 17, dismissed the union's attack on the election. Respondent argues that consequently there was no continuing union activity and that its conduct in September could not have been motivated by a purpose to prevent union organization or as a reprisal for prior protected conduct of Hanger and Masinick. We find this argument invalid. While the election victory did provide the company with a period of repose, it neither suppressed legitimate desire of the union's protagonists to prepare for the next contest nor foreclosed respondent's use of the time also to prepare for it by eliminating from its payroll one union activist and by discriminatory punishment of another, discouraging future union activity.

■ There was evidence that Hanger and Masinick had been the most conspicuous promoters of the union. Their activity was known to respondent and it would be fair to infer that their discipline would be duly noted by the oth-

er employees. While respondent's witnesses testified to poor performance of their duties by Hanger and Masinick as the sole reasons for the discharge of one and discipline of the other, we consider that the Board and its examiner were not without justification in taking cognizance of the timing of the company's action against these men. It was less than a month after the election victory had been made secure by the Regional Director's dismissal of the union's attempt to set it aside. There was much evidence that Hanger, a janitor, was a poor performer and had resisted the company's efforts to provide him with opportunity to equip himself for a better job. The company, however, had long tolerated his shortcomings. The fact that he was not replaced after his discharge was evidence to be weighed, but was not controlling. See our decisions in N. L. R. B. v. Murray Ohio Mfg. Co., 326 F.2d 509, 517 (CA 6, 1964); N. L. R. B. v. West Side Carpet Cleaning Co., 329 F.2d 758, 761 (CA 6, 1964).

Masinick was a veteran employee and as of September 12, respondent's highest paid production worker, being then paid ten cents an hour more than the others. While respondent offered evidence of some occasional lack of good performance, fault cannot be found with the Board's view of him as a good workman. It was shown that he was always responsive to suggestions for improvement or correction. Respondent explained that his ten cent advantage over others was due to his earlier superior skill, but his co-workers had caught up to his skills and claimed that the ten cent across-the-board raise to all but Masinick was merely to correct an inequity. Such thinking, however, was not then disclosed to Masinick or assigned as a reason for the disparate treatment given him on September 12.

█ █ We are not persuaded that the Board and its examiner made unjustified inferences that the treatment of Hanger and Masinick was discriminatory and violated Section 8(a) (3) of the Act. Citation of authorities is not needed to justify our recognition of the Board's

prerogative to draw factual inferences if supported by substantial evidence. We consider that its ultimate inference of violation was so supported. Our holding here is consonant with our previous decision in N. L. R. B. v. Elias Brothers Big Boy, Inc., 325 F.2d 360, 366 (CA 6, 1963).

### IV. *The general pay raise.*

█ We find without evidentiary support the holding that the giving of the general pay raise of September 12, 1962, was violative of the Act.

### V. *Reinstatement of Hanger with back pay.*

█ █ We deny enforcement of the Board's requirement that Hanger be reinstated with back pay. The trial examiner who saw Hanger and heard the evidence of his conduct which followed his discharge recommended denial of reinstatement as well as back pay, saying "In this instance, such remedies would not be in the public interest or effectuate the purpose of the Act." Where the Board disagrees with its examiner, our duty requires our special examination of the evidence. N. L. R. B. v. Tru-line Metal Products Co., 324 F.2d 614, 615 (CA 6, 1963); Burke Golf Equipment Co. v. N. L. R. B., 284 F.2d 943, 944 (CA 6, 1960). The trial examiner had the advantage of observing Hanger's general demeanor and forming a judgment as to how likely he was to fulfill the ugly promises and threats of inflicting crippling mayhem upon two members of respondent's supervisors and that one day he would "get them." We have set out above the involved conduct. The Board's reversal of its trial examiner does not arise from its disagreement with his basic findings that Hanger had indulged in the described conduct, but makes a contrary inference that his ominous threats and gestures were but a *normal* product of "animal exuberance." It does not require very "special examination" of the evidence to find, as we do, that such a factual inference is without evidentiary support. Neither can we join in a view that the purposes of the Act

would be served by requiring an employer to keep in its plant anyone with the propensities for the kind of "animal exuberance" displayed by Hanger. The Board's employment of the exculpating phrase is supported by a footnote reference to an earlier NLRB decision which in turn discloses its genesis in an opinion by Mr. Justice Frankfurter. In Milk Wagon Drivers Union, etc. v. Meadowmoor Dairies, 312 U.S. 287, 293, 61 S.Ct. 552, 555, 85 L.Ed. 836, 841 (1940), in distinguishing between violent and peaceful picketing and as an abstract observation, Justice Frankfurter said,

> "And so the right of free speech cannot be denied by drawing from a *trivial rough incident* or a moment of *animal exuberance* the conclusion that otherwise peaceful picketing has the taint of violence." (Emphasis supplied.)

We are quite satisfied that Justice Frankfurter, when he coined the colorful phrase, did not have in mind the fearsome threats and gestures of employee Hanger. There was other evidence in the record that Hanger had a history of displaying temper and promising physical harm to anyone who should "hurt" him or his family. The trial examiner made no special findings in this regard, but it is clear that Hanger's September 12 conduct was not out of character, and was not merely a momentary and unwonted exhibition of "animal exuberance."

In N. L. R. B. v. National Furniture Mfg. Co., 315 F.2d 280 (CA 7, 1963), the Seventh Circuit denied enforcement of a Board order which had overturned its trial examiner's conclusion that reinstatement and back pay should be denied an illegally discharged employee. Judge Swygert's footnote expression of the reason why an employer should not have to put up with conduct not unlike Hanger's is apt here.

> " * * * his calling in to question respondent's personnel manager's veracity and maternal ancestry on the first day of the Hearing in the instant proceedings, render it diffi-

cult for us to judicially *enforce a renewal of a relationship that bids ill for all concerned.*" (Emphasis supplied.)

See also N. L. R. B. v. Trumbull Asphalt Co. of Del., 327 F.2d 841, 846 (CA 8, 1964); N. L. R. B. v. Valley Die Cast Corp., 303 F.2d 64, 66 (CA 6, 1962).

To the extent that it directs reinstatement of Hanger with back pay and finds a violation in respondent's general pay raise of September 12, 1962, directing a remedy therefor, the Board's order is denied enforcement; in all other respects, its enforcement is ordered.