**PIZZA PRODUCTS CORPORATION and G. & W. Food Products of Ohio, Inc., Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 16697.

United States Court of Appeals Sixth Circuit.

Dec. 7, 1966.

George R. Hewes, Toledo, Ohio, for petitioners.

Joseph C. Thackery, Atty., N.L.R.B., Washington, D. C., for respondent, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Nancy M. Sherman, Atty., N.L.R.B., Washington, D. C., on brief.

Before O'SULLIVAN, PHILLIPS and PECK, Circuit Judges.

HARRY PHILLIPS, Circuit Judge.

A joint petition to review and set aside the order of the National Labor Relations Board has been filed by petitioners, two closely held Ohio corporations. The Board filed a cross application for enforcement of its order, which is reported along with its decision at 153 N.L.R.B. 1265.

The first question to be considered is whether the Board correctly treated the two corporations as a single employer under the Act. The Board held that the two corporations are a single employer for bargaining purposes, finding that: Gustav Feldtmann is president, treasurer, director and shareholder of each of the corporations and is actively engaged in the management of both; his wife and brother serve as directors of both corporations; the two corporations occupy the same premises, one renting space from the other; they share a common bookkeeper, but maintain separate books of account and payrolls for the two corporate entities; employees of the two companies have substantially the same terms and conditions of employment, wage rates and vacation allowance and share the same plant facilities; and employees of one corporation occasionally are "loaned" to the other when there is a temporary need for additional help.

Since these findings of fact are supported by substantial evidence, we conclude that the Board was justified in treating the two corporations as a single employer for jurisdictional purposes. N.L.R.B. v. City Yellow Cab Co., 344 F.2d 575, 577 (C.A. 6); N.L.R.B. v. Elias Brothers Big Boy, Inc., 325 F.2d 360, 362 (C.A. 6).

The union involved is the United Stone and Allied Product Workers of America,

AFL-CIO, herein referred to as the union or the Stone Workers Union, which was found by the Board to represent a majority of the employees in the unit. Also involved is a local United Mine Workers Union, referred to herein as the Mine Workers.

The Board further found: (1) that petitioners violated Section 8(a) (1) of the Act, 29 U.S.C. § 158(a) (1), by threatening to close their plant if the employees selected a union as their representative, and by a coercive poll of employees concerning their union sympathies, and (2) that petitioners violated Section 8(a) (5) of the Act, 29 U.S.C. § 158(a) (5), by refusing to bargain with the union after a majority of employees had signed cards signifying the union as their exclusive bargaining representative. Petitioners were ordered to cease and desist from the Section 8(a) (1) violations, and upon request to bargain collectively with the union as exclusive representative of all employees in the unit.

Petitioners concede that substantial evidence supports the Board's findings concerning the Section 8(a) (1) violations, all of which occurred on August 20, 1964. However, they contend that the Board's findings of Section 8(a) (5) violations are not supported by substantial evidence on the record as a whole, that petitioners were precluded from expressing their good faith doubt of the union's majority status, and that petitioners are not guilty of Section 8(a) (5) violation of refusal to bargain.

As presented to this court, the proceeding is narrowed to the single issue of whether petitioners have violated Section 8(a) (5) by refusal to bargain with the union as the representative of the employees in the unit. In order to dispose of this issue, however, it is necessary to review the facts in some detail, including the Section 8(a) (1) violations.

The Board found that several of petitioners' employees met with a union representative on April 20, 1964. Thereafter membership application cards were distributed and 30 cards had been received by the union as of August 20 bearing the names of employees of petitioners. During a shift change on August 20, Mr. Feldtmann, president of both corporations, called a meeting of employees and stated that he had received a letter from the United Mine Workers of America claiming representation.[1] Mr. Feldtmann told the employees that the company was in poor financial condition, that he could not afford to pay union wages; that if a union came in he would have to close the plant and turn it into a distribution center; and that if the employees chose a union, they would not be able to retain their jobs.

The trial examiner further found that at the conclusion of Mr. Feldtmann's talk, one of the employees (who had signed a union authorization card three days earlier) suggested that a secret vote be taken among the employees to determine whether they wanted a union. A majority of the employees indicated that they favored a vote at that time. Mr. Feldtmann procured pencils and paper and the employees voted. The result of this balloting was seven votes for a union and 34 votes against a union.

Petitioners contend that on the date of this meeting Mr. Feldtmann had no knowledge or means of knowing that the Stone Workers Union had conducted any organizing activities among the employees. Further, because of the letter

1. The trial examiner found that the Mine Workers had written a letter on August 6 to the regional director with carbon copy to Mr. Feldtmann, stating that "in the event a request for representation is raised concerning the employees," the Mine Workers "would be an interested party and wish to be a part of any proceedings involving these employees." However, the Mine Workers had not been engaged in organizing petitioners' employees.

from the United Mine Workers Union noted previously, petitioners assert that Mr. Feldtmann was of the impression that the Mine Workers were interested or engaged in organizing the employees.

Four days after his meeting with the employees, Mr. Feldtmann received a letter from Mr. Harold Etchison, representative of the Stone Workers Union, as follows:

"August 21, 1964

"G & W Food Products Corporation of Ohio
R.R. #1
Pemberville, Ohio

Attention: Mr. Gustav Feldtmann, President

"Gentlemen:

"This is to advise you that our Union, United Stone and Allied Product Workers of America, AFL-CIO, represented the majority of the production and maintenance employees, and all truckdrivers including over-the-road truckdrivers at your Pemberville, Ohio operations, for purposes of collective bargaining.

"We hereby request that you recognize our Union, for purposes of collective bargaining, in all matters pertaining to wages, rates of pay, hours of work, and other conditions of employment, covering the employees in the unit described above.

"We further request that you meet and confer with us for the purpose of negotiating a collective bargaining agreement.

"Kindly advise!

"Yours truly,
Harold Etchison,
    Director, District #3"

Mr. Feldtmann received this letter on August 24, and on the same day replied as follows:

"August 24, 1964

"Mr. Harold Etchison
P. O. Box 1063
Muncie, Indiana

"Dear Mr. Etchison:

"Enclosed find a copy of letter of 8/6/64 sent to the National Labor Relations Board by the United Mine Workers of America.

"Our employees voted 7 to 34 against a union at this time, but I would be very happy to confer with you.

"Very truly yours,
G & W Food Products of Ohio, Inc.

/s/ Gustav H. Feldtmann
Gustav H. Feldtmann"

The Mine Workers' letter enclosed by Mr. Feldtmann was as follows:

"August 6, 1964

"National Labor Relations Board
720 Bulkley Building
1501 Euclid Avenue
Cleveland 15, Ohio

"Re: G & W Food Products Corporation
Highway 199
Pemberville, Ohio

"Gentlemen:
"This is to advise you that in the event a request for representation is raised concerning the employees of the above plant we would be an interested party and wish to be a part of any proceedings involving these employees.

"Sincerely yours,
Thomas V. Badoud
Director, Region 36

"cc: G & W Food Products Corporation"

---

On the same day that Mr. Etchison mailed the above quoted letter to Mr. Feldtmann, he also mailed to the Board's Eighth Regional Office a letter enclosing 30 signed union authorization cards in support of the union's representation petition which he forwarded on that date. This petition was withdrawn on December 4, 1964. The representation petitions filed by petitioners were subsequently dismissed by the Board because of its practice of refusing to process representation cases while charges are pending, unless the charges are waived.

Some ten days after the mailing of his letter of August 21, Mr. Etchison met with Mr. Feldtmann in the latter's office. The record does not present a satisfactory picture of what transpired at this meeting. At the time of the hearing before the examiner Mr. Feldtmann was confined to a hospital with "almost complete blockage of the left kidney" and was not able to testify.[2]

2. Petitioners did not object to closing the hearing without the testimony of Mr. Feldtmann. Thereafter, prior to the announcement of the decision of the trial examiner, they filed a motion to reopen the record and take his deposition. This motion was renewed before the Board. The Board denied this motion by the following ruling:

"Subsequent to the hearing in this case, Respondents filed a motion to adduce the testimony of Gustav Feldtmann by deposition, purportedly to deny that the Union had offered a card check or other proof of majority. Assuming that the Union had not offered to prove its majority, the Trial Examiner stated that fact would not alter his findings and he accordingly denied the motion. Respondents thereafter renewed their motion before the Board. The record shows that at the time of the hearing, Gustav Feldtmann was confined to the hospital but Respondents did not request a continuance. At the close of General Counsel's case, Respondents proceeded to introduce evidence and call witnesses. At the conclusion of their case, Respondents rested and did not request a postponement in order to secure Feldtmann's testimony. In view of the foregoing the motion to reopen the record is denied. Even assuming, without deciding, that the Union did not offer to prove its majority, it nevertheless would not warrant a reversal of the finding that Respondents violated Section 8(a) (5). Further, as the record and brief fully present the issues and positions of the parties, Respondents' request for oral argument is denied."

Only Mr. Feldtmann and Mr. Etchison were present in Mr. Feldtmann's office at the time of the conference in question. Since Mr. Feldtmann did not testify, the Board's findings necessarily are based entirely upon the testimony of Mr. Etchison.

The trial examiner made the following findings, based upon Mr. Etchison's testimony:

"About 10 days after mailing the August 21 letter demanding recognition, Etchison met with Feldtmann in the latter's office. Etchison's undenied testimony, which I credit, is that he repeated the claim that the Union represented a majority and suggested that they 'sit down and negotiate a contract.' Etchison also testified that he said the Union was willing to have a card check to determine its majority status. Feldtmann, so Etchison testified, refused to recognize the Union, said that the employees had a right to vote on union representation, suggested that they wait about a year before anything be done 'about the union,' and expressed the view that negotiations would cause a financial burden on him. Etchison testified he told Feldtmann that the Union could not wait a year, that the employees wanted a union, and stated that the Union was not going 'to negotiate him out of his plant.' There was no discussion of the petition then on file with the Regional Office. Feldtmann, according to Etchison, stated that he would contact his attorney, who was out of town, and then get in touch with Etchison. Some time later Etchison received a letter from counsel for the Respondents, the contents of which are not disclosed by the record, but he did not hear directly from Feldtmann."

A careful reading of Mr. Etchison's testimony, particularly on cross-examination, reveals that he made no positive statement that the union ever offered to prove its majority to Mr. Feldtmann. If in fact the existence of the representation cards, which already were on file with the Board, was disclosed to Mr. Feldtmann, there is no evidence that any definite procedure was suggested for checking the cards. Further there was reason for Mr. Feldtmann to have believed at that time that a Board-supervised election was in the offing.

When the two corporations were treated as a single employer, there were 52 employees in the unit, of whom 30 signed Stone Workers union authorization cards.[3] The validity of 20 of these cards is not in dispute. Of the remaining 10 the trial examiner and the Board counted 8 and rejected 2, thus finding that 28 of the 52 unit employees had signed valid cards. The petitioners contend that at least 4 of the 8 cards should have been rejected, and that the union in no event was authorized to represent more than 24 of the 52 employees, three less than a majority.

Thus the majority as found by the Board is based upon cards individually solicited, and not upon a Board-supervised election. This procedure has been described as a "notoriously unreliable method of determining majority status of a union," N.L.R.B. v. Flomatic Corp., 347 F.2d 74, 78 (C.A.2), quoting Sunbeam Corp., 99 N.L.R.B. 546, 550–51. In the same case the court said:

"A bargaining order, however, is strong medicine. While it is designed to deprive employers of a 'chance to profit from a stubborn refusal to abide by the law,' Franks Bros. Co. v. N.L.

3. Aside from the top heading of the card bearing the full name of the union, its affiliation and address, the cards read as follows:

"Date.......... 19....
"I hereby accept membership in the United Stone and Allied Products Workers of America, and of my own free will hereby authorize the U.S.A.P. W.A., its agents or representatives to act for me as a collective bargaining agency in all matters pertaining to rates of pay, wages, hours of employment, or other conditions of employment.
EMPLOYED BY _____
Name of Company   Address of Company
Name of Applicant   Address of Applicant"

R.B., supra, 321 U.S. at 705, 64 S.Ct. at 819 [88 L.Ed. 1020] and although it undoubtedly operates to deter employers from adopting illegal intrusive election tactics, its potentially adverse effect on the employees' § 7 rights must not be overlooked. See Medo Photo Supply Corp. v. N.L.R.B., supra, 321 U.S. at 688, 697–698, 64 S.Ct. at 835, 839–840 [88 L.Ed. 1007] (Rutledge, J. dissent). That section protects the right of employees to join or refrain from joining labor organizations. And that right is implemented by § 9(c) (1) which provides for representation elections by secret ballot. Since a bargaining order dispenses with the necessity of a prior secret election, there is a possibility that the imposition of such an order may unnecessarily undermine the freedom of choice that Congress wanted to guarantee to the employees, and thus frustrate rather than effectuate the policies of the Act.

" * * * moreover it is beyond dispute that secret election is a more accurate reflection of the employees' true desires than a check of authorization cards collected at the behest of a union organizer." 347 F.2d at 78.

■■ The rule in this Circuit for the use of authorization cards by a union in establishing its right to represent employees as bargaining agent is set forth in N.L.R.B. v. Cumberland Shoe Corp., 351 F.2d 917 (C.A.6), and N.L.R.B. v. Winn-Dixie Stores, Inc., 341 F.2d 750 (C.A.6), cert. denied, 382 U.S. 830, 86 S.Ct. 69, 15 L.Ed.2d 74. The Board may order an employer to bargain with a union, upon its request, when the union has been designated by authorization cards signed by a majority of the employees involved, if the union did not misrepresent the purpose for which the cards were to be used. If the employer is laboring under a good faith doubt as to the union's majority status, however, he will not be required to extend recognition. An employer will not be permitted to refuse recognition of the union when there is no basis for a good faith

doubt, and the real purpose of seeking a Board-supervised election is to gain time in which to undermine the union's majority status.

In *Cumberland Shoe* we said:

"The underlying problem in this whole area is, of course, that of determining from the record of testimony before an NLRB Trial Examiner whether or not the employer's refusal to bargain was based upon a 'good-faith doubt,' or on the contrary, was a mere device on the part of the employer to take such steps as he could to deprive the union of employee support needed to constitute that majority. In cases such as this, where the employer's unfair labor practices are clearly established, both before and after the demand for bargaining, the good faith of his doubts of the union majority may properly be regarded with some suspicion." 351 F.2d at 920–921.

In the present case all the Section 8(a) (1) unfair labor practices occurred on August 20, 1964, in connection with Mr. Feldtmann's speech to the employees and the ballot conducted on that occasion. There is no evidence of any Section 8(a) (1) violations after the date the Union contends it made its demand for bargaining.

In John P. Serpa, 155 N.L.R.B. No. 12, the Board stated the rule in such cases as follows:

"Where the General Counsel seeks to establish a violation of Section 8(a) (5) on the basis of a card showing, he has the burden of proving not only that a majority of the employees in the appropriate unit signed cards designating the Union as bargaining representative, but also that the employer in bad faith declined to recognize and bargain with the Union. This is usually based on evidence indicating that respondent has completely rejected the collective-bargain principle or seeks merely to gain time within which to undermine the Union and dissipate its majority." (Citing Joy Silk Mills, 85 NLRB, 1263, enfd. 87 U.S.App.D.C. 360, 185 F.2d 732).

■ In such a situation, the Board's order requiring an employer to bargain with a union will not be enforced if there is no substantial evidence on the record as a whole to establish that the employer in bad faith refused to recognize and bargain with the union. N.L.R.B. v. Great Atlantic & Pacific Tea Co., 346 F. 2d 936 (C.A.5); Fort Smith Broadcasting Co. v. N.L.R.B., 341 F.2d 874 (C.A. 8); Edward Fields, Inc. v. N.L.R.B., 325 F.2d 754 (C.A.2).

The ultimate finding of the trial examiner in the present case was that petitioners "in refusing to bargain, were not motivated by a good faith doubt regarding the Union's majority. On the contrary, I find that they declined to recognize and bargain with the union because they sought to avoid their statutory obligation."

■ We hold that this finding is not supported by substantial evidence in the record considered as a whole. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. The evidence shows that Mr. Feldtmann was of the impression that the Mine Workers was seeking to organize the plant. Although he expressed animus against *any* union and clearly was guilty of Section 8(a) (1) violations, there is no showing that he was aware or had an opportunity to become aware of the fact that a substantial number of the employees had signed the Stone Workers authorization cards.[4] Copies of the cards were not proffered to him. The letter of Mr. Etchison dated August 21, 1964, claimed a majority only in general terms. This letter was addressed to petitioner G & W Food Products Corporation. No similar letter was ever written to petitioner Pizza Products Corp. Upon the basis of information

then available to him, Mr. Feldtmann may have concluded that two unions were competing to represent the employees and could have entertained a good faith doubt as to which if either union represented a majority. See Ohio Ferro-Alloys Corp. v. N.L.R.B., 213 F.2d 646 (C.A.6). Even if the 30 signed authorization cards had been submitted to him, he might well have entertained a good faith doubt as to the validity of a sufficient number of the cards to constitute a majority, especially in the light of the slender majority ultimately found by the Board.

We reemphasize that there is no evidence of any Section 8(a) (1) violations after the initial offenses which occurred on August 20; nor is there evidence of any effort or intent on the part of petitioners to undermine the union's majority by continuing unfair labor practices. Mr. Feldtmann's above-quoted letter dated August 24, 1964, by its terms did not express a refusal to bargain, but stated, "I would be very happy to confer with you." This court does not have the benefit of any testimony from Mr. Feldtmann, a key witness, due to his hospital confinement during the hearing and the subsequent refusal of the Board to allow his testimony to be taken by deposition.

Counsel for the Board contends that Mr. Feldtmann's testimony in any event would have been immaterial; that the decision of the Board would not have been different even if Mr. Feldtmann had testified to ignorance as of August 20 that the organizing campaign was being conducted by the Stone Workers and not by the Mine Workers; that "this testimony, even if credible, is immaterial, since Feldtmann's refusal to bargain was not motivated by such alleged ignorance;" and that Mr. Feldtmann's testimony "could not change the result of the

4. The trial examiner attached much significance to the testimony of one pro-union employee to the effect that Mr. Feldtmann told the employees on August 20 "that 90% of the employees had signed for a union to represent the company. That we evidently wanted a union." This testimony was not supported by any other witness and is contradicted by the author-ization cards themselves. The union never claimed that ninety per cent of the employees had signed authorization cards. Considering the record as a whole, we find that this "90%" testimony does not constitute substantial evidence that Mr. Feldtmann knew on August 20 that a majority of the employees had signed authorization cards.

case." We are not favorably impressed with this argument.

Enforcement is denied of those parts of the order of the Board requiring that petitioners upon request bargain collectively with the union as exclusive representative of the employees in the unit and that they cease and desist from refusing to do so. In all other respects enforcement is granted.