G. P. D. INC., Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 17860.

United States Court of Appeals Sixth Circuit.

Jan. 17, 1969.

**28**

James D. Tracy, Detroit, Mich., for petitioner; Timothy K. Carroll, Dykema, Wheat, Spencer, Goodnow & Trigg, Detroit, Mich., on brief.

Abigail Cooley Baskir, Atty., N.L.R.B., Washington, D. C., for respondent; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Michael N. Sohn, Atty., N.L.R.B., Washington, D. C., on brief.

Before EDWARDS, CELEBREZZE, and McCREE, Circuit Judges.

McCREE, Circuit Judge.

This case is before us on petition to review and set aside, and on cross-petition to enforce, an order of the National Labor Relations Board. The Board's Decision and Order are reported at 163 NLRB No. 114. Petitioner, a Michigan corporation having its principal place of business in Ferndale, Michigan, is engaged in the sale and distribution of automobile replacement parts to Ford dealers. The controversy is the result of the Union's [1] attempt to obtain recognition as the exclusive bargaining agent of the Company's driver-salesmen and warehousemen. These two groups concededly constitute an appropriate bargaining unit.

In August, 1965, employee Joseph Paladino conferred with Jerome Coleman, an organizer and business agent of the Union, and they eventually arranged a meeting of the employees for the evening of August 27. This meeting was attended by eight of the Company's employees [2] and seven [3] of them signed cards authorizing the Union to act as their collective bargaining representative.

On August 31, Mr. Emmet Tracy, the president and treasurer of the Company and a principal stockholder, received a letter from the Union demanding recognition for the purpose of collective bargaining. The letter stated:

Dear Sir:

This is notify [sic] you that a majority of your employees in the collective bargaining unit described below have designated Teamsters Local 337 as their exclusive collective bargaining representative. In view of such designation, we demand recognition, for purposes of collective bargaining, as the exclusive representative of such employees. The collective bargaining unit in which we demand recognition consists of driver-salesmen and warehousemen.

Please advise this office if and when it is possible for a meeting to be held for the purpose of negotiating a collective bargaining agreement.

In the event of any discrimination against any of your employees because of their union activities, or in the event of your refusal to bargain with us, we will take prompt action to remedy such discrimination or refusal to bargain.

Very truly yours,
Jerry Coleman
Business Representative
Teamsters Local 337

---

1. Local 337, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

2. All the warehousemen and driver-salesmen except one were in attendance. In addition, Charles Markos, a former warehouseman who was transferred to a clerical position was present.

3. Markos also signed a card but his was not considered in determining the Union's majority.

The next day Mr. Tracy responded to the Union's letter as follows:

Attention: Mr. Jerry Coleman

I have received and read with interest your letter of August 30 which was forwarded to me at Harbor Point and as I do not want any time to intervene before the contents of your letter becomes known I am replying promptly.

As you may know our business is seasonal and for the past five or more years we have employed only two or at most three men in our warehouse during eight or nine months of the year. During the summer months we must provide replacements for our salesmen during their vacation periods and prior to and during this period we hire temporary help for the summer months.

It would not be surprising if some or all of the temporary help in anticipation of permanent employment would have contacted your offices for organizing assistance.

These temporary workers all of whom will be released before September 15, 1965, as the summer season will then be over may favor your organization, but I am confident that the balance of our regular employees are not interested in having you or any other organization representing them.

When you consider the bulk if not all of the Ford Dealers Salesmen and Parts Men on whom our salesmen depend for sales and their livelihood have expressed on many occasions their desire not to be unionized their probable reaction to unionization of our company is almost certain to be detrimental to the sales of our company and the sales and compensation of our commission salesmen.

Because of these conditions over which we have no control it could be a very expensive experiment for our permanent employees and as you know, one from which there could be no retreat once the news was out in the hands of the Dealers and their probable reaction determined.

The value of outside assistance to the employees of an organization having only two or three warehouse employees and three or four outside commission salesmen is at the least very questionable although I would not expect you to agree.

I am attaching a copy of a letter mailed today to all employees for your information.

. If you really believe you represent a majority of our permanent employees I would suggest that you arrange to have the National Labor Relations Board schedule an election to determine the accuracy of your claim.

Very truly yours,
E. E. Tracy

As the letter recites, a copy was sent to each of the Company's employees.

Following the receipt of this letter, the Union, on September 2, filed a petition with the Board requesting certification as the representative of the driver-salesmen and warehousemen. However, because of the subsequent filing of unfair labor practice charges, there have been no further proceedings pursuant to this petition for an election.

On September 7, Mr. Tracy separately interviewed at least five employees, including Raymond Horne, Michael Zamm and Joseph Paladino. During the interview with Horne, he stated that anyone carrying a union card probably could not get a job as a Ford Motor Company representative. During the interviews with Zamm and Paladino, he informed them that they were to be discharged. Zamm's employment was terminated on September 7 and Paladino's the next day.

These discharges precipitated a strike by the Company's employees which began about September 9. Of the seven employees who went on strike, three returned to work during the last week of October. On November 23, Union agent Coleman sent a telegram to the Company requesting the reinstatement of the remaining four employees (this group in-

cluded Zamm and Paladino) and informing the Company that they would report for work on November 29. None of the four reported on the 29th, but three of the four (Morris, Andrus and Paladino) did subsequently contact the Company and discuss the question of reinstatement. Their efforts, however, were unsuccessful.

This series of events formed the basis for alleged violations of Sections 8(a) (1), 8(a) (3) and 8(a) (5) of the National Labor Relations Act as amended, 29 U.S.C. §§ 158(a) (1), 158(a) (3) and 158(a) (5). The trial examiner found that petitioner violated Section 8(a) (1) of the Act by threatening in its letter of September 1 to discharge employees engaging in union activity; by predicting in the same letter a loss of sales and the concomitant loss of commissions for the driver-salesmen as a result of unionization; and by threatening employee Horne with blacklisting with respect to securing employment at the Ford Motor Company. He also found that petitioner violated Sections 8(a) (3) and 8(a) (1) of the Act by discriminatorily discharging Zamm and Paladino, and by refusing to reinstate employees Morris and Andrus. Finally, he found that petitioner violated Sections 8(a) (5) and 8(a) (1) of the Act by refusing to recognize and bargain collectively with the Union.

The trial examiner recommended that the Company cease and desist from its violations of the Act. As affirmative relief, he recommended that, upon request, the Company bargain collectively with the Union; that it offer to employees Zamm, Morris and Andrus reinstatement and make them whole for any loss of earnings; and that it make employee Paladino whole for any loss of earnings suffered up to December 1, 1965.[4]

4. The examiner found that as of December 1 the Company had offered to reinstate Paladino to the same job he had held prior to his discharge and that Paladino had refused this offer. The discrimination against him therefore ended as of that date.

The Board affirmed the findings of the trial examiner and adopted his recommended order. Upon consideration of the record as a whole, we conclude that there is substantial evidence to support the Board's finding of a Section 8(a) (1) violation to the extent hereinafter pointed out. We also find substantial evidence to support their decision with respect to the Section 8(a) (3) violations. We do not, however, find substantial evidence to support the Board's decision with respect to other Section 8(a) (1) violations and the Section 8(a) (5) violation.

## Section 8(a) (1)

In his letter of September 1, Emmet Tracy asserted that the Company's business was "seasonal" and that it was probably the "temporary" employees, all of whom were to be discharged prior to September 15, who had contacted the Union. The Board construed his language as a warning to *all* employees that they would be dismissed if they engaged in Union activity. This was based on the fact that, contrary to the petitioner's assertion, there was no evidence indicating that its business was "seasonal" or that it hired "temporary" help during the summer months. None of the driver-salesmen or warehousemen working for the Company during the organization campaign had been told they were temporary employees and four of them testified that they had no knowledge of any such Company policy.[5]

■ We agree with the Board's finding that the letter constituted an unlawful threat of discharge. However, we do not agree that it was directed at *all* of the employees who supported the Union. There is nothing, except the Board's interpretation of the "underlying meaning" of the letter, which supports a finding that the threat was so

5. Although one employee testified in support of Tracy's assertion, the trial examiner discredited his testimony because it was "vague and indefinite."

all-encompassing. To the contrary, the letter alludes to "replacements * * * for the summer months" and would therefore seem to be aimed only at those employees who had been hired just prior to the summer. No employees other than Zamm and Paladino fit this description and thus, although the letter contained an unlawful threat of discharge, it was directed solely at them.

■ The issue with respect to the threat of lost commissions as a result of unionization is whether Tracy's assertion was a coercive warning or merely a prediction. It is well-settled that "the prediction of unfavorable consequences resulting from unionization is not a violation of the Act, provided that it is a prediction of such consequences, rather than a threat on the part of the employer to visit such consequences upon the employees in the event of unionization." Surprenant Mfg. Co. v. N. L. R. B., 341 F.2d 756 (6th Cir. 1965). See also, Union Carbide Corp. v. N. L. R. B., 310 F. 2d 844 (6th Cir. 1962).

In determining that Tracy's statements were illegal threats, the Board relied on International Union of Elec. Workers, etc. v. N. L. R. B., 110 U.S.App.D.C. 91, 289 F.2d 757 (D.C.Cir.1960). Prior to the IUE case, the general rule was that an employer's prediction of unpropitious economic consequences in the event of unionization was illegal only when it was within the employer's power to effect those consequences. N. L. R. B. v. Nabors, 196 F.2d 272, 276 (5th Cir. 1952), cert. denied, 344 U.S. 865, 73 S.Ct. 106, 97 L.Ed. 671 (1953). The D. C. Circuit broadened this rule in IUE and held that, despite an employer's inability to personally carry out a prediction of dire consequences, a categorical assertion that "third parties, who had [the] power, had already determined to exercise it" was also an illegal threat when there was no "reasonable basis" for a belief in the truth of the assertion. 289 F.2d at 763.

■ We think the Board's reliance on this decision is misplaced. Tracy did not "categorically" assert that Ford dealers

had decided to refuse to deal with his driver-salesmen if they became unionized. To the contrary, he expressed his opinion in terms of the "probable reaction" of those dealers. Moreover, Tracy's prediction was not "drawn from thin air", since there had been abortive attempts to organize Ford dealers in the territory served by his salesmen. See John Mach Ford Sales, Inc., 7–RC–7491 (NLRB); Russ Dawson Ford, 7–RC–7645 (NLRB); O'Green Ford, 7–RC–7627 (NLRB). Thus, we find that Tracy's statement was no more than his prediction of a probable consequence over which he had no control, and as such was within the free speech guarantee of Section 8(c), 29 U.S.C. § 158(c). See N. L. R. B. v. Transport Clearings, Inc., 311 F.2d 519, 524 (5th Cir. 1962).

■ Similarly, Tracy's statements to employee Horne were couched in terms of a probable consequence of union membership and were not unqualified assertions that such membership would foreclose employment opportunities at Ford Motor Co. Indeed, Horne testified that Tracy's statement was "just brought up as an example" of what "probably" would happen if he applied for a job at Ford. Thus, the IUE decision is again distinguishable. Also distinguishable is Leeds Shoe Store, 149 N.L.R.B. 500 (1964), which was cited by the Board. There the employer's statement, unlike that involved here, was characterized as an assertion that those who joined the union *could not* thereafter obtain work at retail stores. We therefore find that Tracy's statement to Horne was also a legitimate prediction and did not violate Section 8(a) (1). Cf. Seidmon, d/b/a Southwester Co., 111 N.L.R.B. 805 (1955).

### Section 8(a) (3)

■ Upon consideration of the record as a whole, we find that there is substantial evidence to support the Board's decision that Zamm and Paladino were discharged because of actual or suspected Union activity and that these discharges therefore violated Sections

8(a) (3) and 8(a) (1) of the Act. As stated earlier, there was no credible evidence introduced to establish the Company's contentions that its business was seasonal and it hired temporary help during the summer. Even more significant is the fact that neither Zamm nor Paladino had ever been informed that he had been hired on a "temporary" basis. Indeed, both had been complimented on their performances and had been given raises during their periods of employment. Finally, the timing of the discharges and the absence of any evidence of a decrease in the Company's business at the time are also factors supporting the finding of an improper purpose on the part of the Company.

■■ Since the discharges were unlawful, the employees' strike to protest them was an unfair labor practice strike. The striking employees were therefore entitled to reinstatement to their former, or substantially equivalent, positions upon their unconditional offers to return to work.[6] Mastro Plastics Corp. v. N. L. R. B., 350 U.S. 270, 278, 76 S.Ct. 349, 100 L.Ed. 309 (1956); Philip Carey Mfg. Co., etc. v. N. L. R. B., 331 F.2d 720, 729 (6th Cir. 1964), cert. denied, International Union, United Auto, Aerospace & Agr. Implement Workers etc. v. Philip Carey Mfg. Co. etc., 379 U.S. 888, 83 S.Ct. 159, 13 L.Ed.2d 92 (1964). The Company acknowledges its obligation to reinstate, but contends that neither Morris or Andrus ever made a *bona fide* request to return to work.

■ No special procedure must be followed in applying for reinstatement and generally it is a question of fact whether such an application has been made. The Board found that Morris and Andrus asked the Company if they could return to work and there is substantial evidence in the record to support this finding. It is undisputed that Andrus meet with Tracy in early December of 1965 and stated his desire to return. Tracy's response was an offer of a job not substantially equivalent to that previously held by Andrus. Although Morris never discussed his return with Tracy personally, he did call Tracy's son, the warehouse manager, and asked him whether he could come back to work. Tracy's son said he would have to discuss it with his father and that he would let Morris know. No one from the Company ever called Morris after that with respect to reinstatement. Therefore, the Company unlawfully refused to reinstate both Andrus and Morris in violation of Section 8(a) (3).

## Section 8(a) (5)

The Board found that the Company refused to recognize and bargain collectively with the Union in order to obtain time within which to undermine the Union's majority and not because of any good faith doubt it entertained. Based on this violation of Section 8(a) (5) the Board ordered the Company to bargain collectively with the Union upon request.

■ When a union has obtained valid authorization cards from a majority of the employees in an appropriate bargaining unit an employer violates Section 8(a) (5) if, without a good faith doubt, he responds to the union's bargaining demand by insisting on an election.[7] N. L. R. B. v. Cumberland Shoe Corp., 351 F.2d 917, 920–921 (6th Cir. 1965); N. L. R. B. v. Winn-Dixie Stores, 341 F.2d 750, 755 (6th Cir. 1965), cert. denied, 382 U.S. 830, 86 S.Ct. 69, 15 L. Ed.2d 74 (1965). The General Counsel, however, has the burden of proving the employer's lack of good faith. Lane

---

6. Of course, as to the discriminatorily discharged employees, Zamm and Paladino, the Company was obligated to offer reinstatement regardless of whether they applied for it. See R. J. Oil & Refining Co., 108 N.L.R.B. 641 (1954); Root-Carlin, Inc., 92 N.L.R.B. 1313 (1951). The Company did offer Paladino his former job, but Paladino rejected the offer. See note 4, supra. No offer, however, was ever made to Zamm and the Board's order therefore required that such an offer be made.

7. In his letter of September 1, Mr. Tracy suggested that an election be held to test the Union's claim of majority status.

Drug Co. v. N. L. R. B., 391 F.2d 812, 818 (6th Cir. 1968); N. L. R. B. v. River Togs, Inc., 382 F.2d 198, 206 (2nd Cir. 1967). We find that in the instant case the General Counsel has failed to sustain this burden.

In its letter to the Company demanding recognition, the union gave no indication that it was prepared to verify its majority status. Although it asserted that a majority of the Company's employees had designated the Union as their bargaining agent, it did not reveal the number of authorization cards it possessed, nor did it offer to substantiate the existence of the claimed majority by means of a card check. Under these circumstances we believe the Company's suggestion of an election was an appropriate response and that, contrary to the Board's contention, it was justified in questioning the Union's claim of majority status.

The Board, citing N. L. R. B. v. C. J. Glasgow Co., 356 F.2d 476, 479 (7th Cir. 1966), contends that the Company's failure to take action to attempt to verify the Union's claim is evidence of its bad faith. However, in *C. J. Glasgow*, the company involved made *no* reply to the Union's demand for recognition. Here the Company responded by suggesting an election, the statutory verification procedure.[8]

▮ Moreover, the Board fails to cite this court's decision in N. L. R. B. v. Downtown Bakery Corp., 330 F.2d 921 (6th Cir. 1964), where it was held that because " 'proof of majority status is peculiarly within the special competence of the union'. * * * the burden of coming forward with proof of its alleged majority status [is] upon the union."

330 F.2d at 927. Since it is incumbent upon the party which is cognizant of the facts relevant to a claim of majority status—the Union—to come forward with proof of its claim (either by revealing or expressing a willingness to reveal, such as by an offer of a card check, the basis for its claim), it is not evidence of bad faith that an employer reacted to a "naked" assertion of majority status by suggesting an election rather than by inquiring into the claim.

▮ The Board also points to the unfair labor practices engaged in by the Company as evidence of a lack of good faith. This circuit, however, has decided that the commission of unfair labor practices is not necessarily inconsistent with the existence of a good faith doubt concerning a union's majority status. N. L. R. B. v. Ben Duthler, Inc., 395 F.2d 28, 31 (6th Cir. 1967). The Board concedes that this proposition is correct but attempts to limit its application to cases involving violations of Section 8(a) (1). In Lane Drug Co. v. N. L. R. B., 391 F.2d 812 (6th Cir. 1968), a case involving unlawful discharges, this circuit rejected the imposition of such a restriction and decided that, "The fact that the employer committed unfair labor practices in violation of Section 8(a) (1) *and 8(a) (3)* is not of itself sufficient reason to negative a good faith doubt." 391 F.2d at 820 (emphasis added).

We previously alluded to the fact that the Board's bargaining order was based on its finding of a refusal to bargain in violation of Section 8(a) (5) by the Company. Having decided that the General Counsel failed to sustain the burden of proving the Company's lack of a good faith doubt with regard to the Union's claim of majority status, we must now

---

8. It is also significant that the Seventh Circuit's reference to the company's failure to act was made in the following manner: Here there is no evidence of probative value to justify good faith doubt. In addition to its failure to reveal any reason for their 'belief' the record discloses no action upon the part of Glasgow * * * to attempt to verify the Union's claim * * *. 356 F.2d at 479.

The Seventh Circuit apparently imposes the burden of establishing a good faith doubt on the company as opposed to the rule of this Circuit, and others, whereby the General Counsel has the burden of establishing a lack of good faith. See Lane Drug Co. v. N.L.R.B., 391 F.2d 812, 818 (6th Cir. 1968); N.L.R.B. v. River Togs, Inc., 382 F.2d 198, 206 (2nd Cir. 1967).

assess the propriety of that bargaining order.

This court has enforced a bargaining order based solely on violations of Section 8(a) (1) of the National Labor Relations Act. N. L. R. B. v. Delight Bakery, Inc., 353 F.2d 344 (6th Cir. 1965).[9] Contra, Lane Drug Co. v. N. L. R. B., 391 F.2d 812, 820 (6th Cir. 1968). On the other hand, subsequent to the decision in *Delight Bakery* this court said an "order requiring an employer to bargain with a union will not be enforced if there is no substantial evidence on the record as a whole to establish that the employer in bad faith refused to recognize and bargain with the union." Pizza Products Corp. v. N. L. R. B., 369 F.2d 431, 438, (6th Cir. 1966). Accord, Peoples Service Drug Stores, Inc. v. N. L. R. B., 375 F.2d 551, 556 (6th Cir. 1967); Lane Drug Co. v. N. L. R..B., 391 F.2d 812, 820 (6th Cir. 1968). More recently, however, the court once again indicated that a bargaining order would, in some instances, be an appropriate remedy despite the General Counsel's failure to prove an employer's lack of good faith in rejecting a union's demand for recognition. Pulley v. N. L. R. B., 395 F.2d 870 (6th Cir. 1968); N. L. R. B. v. Ben Duthler, Inc., 395 F.2d 28 (6th Cir. 1968). In *Ben Duthler*, after the court concluded that the Board's finding of an unlawful refusal to bargain was not supported by substantial evidence, it went on to point out that the primary responsibility for establishing appropriate remedies "lies with the Board; and where on substantial evidence the Board concludes that a company's illegal interference with its employee's rights to organize and bargain collectively caused the loss of majority status by a union it has discretion to fashion an effective remedy (including a bargaining order) to restore the status quo ante." 395 F.2d at 33.[10]

We therefore find it appropriate to remand this case to the Board for consideration of the apposite remedy. In fashioning that remedy, the Board should focus on whether it is still feasible to have an election untainted by the unfair labor practices of the Company. Although a bargaining order is often the only effective means of denying an employer the benefit of his illegal actions, it dispenses with an election and may therefore "unnecessarily undermine the freedom of choice that Congress wanted to guarantee to the employees, and thus frustrate rather than effectuate the policies of the Act." N. L. R. B. v. Flomatic Corp., 347 F.2d 74, 78 (2nd Cir. 1965). See also, N. L. R. B. v. Ben Duthler, Inc., supra. For this reason the bargaining order should be employed only when alternative remedies would be ineffective.

Of course, the seriousness of an employer's unfair labor practices is also relevant. This relevance, however, extends only to the relationship of the severity of the unfair labor practices to the ultimate inquiry of whether a fair election can still be held. Regardless of how serious an employer's violations are, this should not in itself result in a bargaining order. See Lesnick, *Establishment of Bargaining Rights Without an NLRB Election*, 65 Mich.L.Rev. 851, 859–863 (1967). Board orders are remedies, not penalties. See St. Antoine, *A Touchstone for Labor Board Remedies*, 14 Wayne L.Rev. 1039, 1040 (1968).

The Board's order is enforced with respect to the Section 8(a) (1) violation to the extent hereinbefore approved, and is enforced with respect to the Section 8(a) (3) violations. However, enforcement is denied with respect to the other Section 8(a) (1) violations and the Section 8(a) (5) violation; and the case is remanded for further consideration of the proper remedial order.

---

9. In *Delight Bakery* an alleged violation of Section 8(a) (5) was dismissed by the Board and not considered by this court.

10. We observe in passing that in both *Pulley* and *Ben Duthler* the unfair labor practices engaged in by the employer were not deemed serious enough to warrant an order to bargain.

EDWARDS, Circuit Judge (dissenting).

Respondent's reaction to the union's claim of representation and demand for bargaining rights was to write a letter to the union business agent which said in part:

"As you may know our business is seasonal and for the past five or more years we have employed only two or at most three men in our warehouse during eight or nine months of the year. During the summer months we must provide replacements for our salesmen during their vacation periods and prior to and during this period we hire temporary help for the summer months.

"It would not be surprising if some or all of the temporary help in anticipation of permanent employment would have contacted your offices for organizing assistance.

"These temporary workers all of whom will be released before September 15, 1965, as the summer season will then be over may favor organization, but I am confident that the balance of our regular employees are not interested in having you or any other organization representing them."

The president of the company also sent copies of this letter to all the employees involved.

The Board found no evidence that respondent's business was seasonal or that any of the employees had been hired as temporary employees. Under the facts of this case the Board was certainly entitled to infer this letter was a threat to discharge union adherents among its warehouse employees and its driver salesmen. NLRB v. Bin-Dicator Co., 356 F.2d 210 (6th Cir. 1966).

Shortly thereafter respondent discharged (or failed to rehire) four employees. This constituted a majority of the union's majority when its representation letter was written. The Board found (and we have found) that these discharges were discriminatory and in violation of the National Labor Relations Act.

On these facts the Board held:

"The reasons set forth in his September 1 letter to the Union, rather than revealing a reasonable basis for doubting the Union's majority, constituted a patent and unlawful attempt to dissuade the employees from supporting the Union. Respondent's defense to the Section 8(a)(5) charge herein is that it had a good-faith doubt that the Union represented a majority of the employees in the appropriate unit. 'This good-faith doubt must have some reasonable basis and is not established merely by the employer's assertion of doubt of the majority.' N. L. R. B. v. Superior Sales, Inc., 63 LRRM 2197, 2203 [366 F.2d 229] (C.A.8). No reasonable basis for doubt of the Union's majority on the part of the Company has been shown. To the contrary, the conduct of the Respondent herein from the date it first received the Union's demand for recognition demonstrated a desire on its part to frustrate its employees' self-organizational aspirations and to undermine the Union's majority. The Company rejected the Union's bargaining request, not because it entertained a good-faith doubt as to the Union's majority, but because it rejected the collective-bargaining principle and was seeking time within which to evaporate the Union's strength. In such circumstances, therefore, the Company's refusal to recognize and bargain collectively with the Union constituted violations of Section 8(a)(1) and (5) of the Act."

I believe that on this record the Board had sufficient evidence to reject respondent's good-faith doubt claim and to find that respondent refused to bargain because it "rejected the collective-bargaining principle and was seeking time within which to evaporate the Union's strength." In its essentials this case seems to me to be on all fours with NLRB v. Priced-Less Discount Foods, Inc., 405 F.2d 67 (6th Cir. 1968);

Thrift Drug Co. v. NLRB, 404 F.2d 1097 (6th Cir. 1968); NLRB v. Cumberland Shoe Corp., 351 F.2d 917 (6th Cir. 1965); NLRB v. Winn-Dixie Stores, Inc., 341 F.2d 750 (6th Cir.), cert. denied, 382 U.S. 830, 86 S.Ct. 69, 15 L.Ed.2d 74 (1965); Joy Silk Mills v. NLRB, 87 U.S.App.D.C. 360, 185 F.2d 732 (D.C.Cir. 1950), cert. denied, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350 (1951).

Absent the gross violations of the NLRA referred to above, I would join my colleagues in holding that the union should have taken the initiative and offered a card check of its majority. But I hardly see how we can hold that the respondent fired 50% of the employees in the bargaining unit for the unlawful purpose of interfering with employee rights to collective bargaining and still hold that this record does not support the Board's finding that respondent in bad faith refused to recognize and bargain with the union.

What this court has just said in another case seems entirely appropriate to this case:

"All in all, the course of conduct shown on the part of petitioner immediately after receipt of the union's demand for bargaining rights was that of an employer determined to defeat unionization regardless of the wishes of the employees and completely without regard to the law. The violation of the NLRA found in this case can by no means be characterized as 'borderline' section 8(a) (1) violations as in NLRB v. Ben Duthler, Inc., 395 F.2d 28 (6th Cir. 1968), or as 8(a) (1) violations 'without more' as in Lane Drug Co. v. NLRB, 391 F.2d 812 (6th Cir. 1968). * * * The Trial Examiner and the Board had ample reason to conclude that petitioner's course of conduct represented rejection of collective bargaining rather than a good faith doubt of the union's majority status.

"Under the factual circumstances of this case, we believe that the findings and conclusions of the Board have substantial support in this whole record.

Universal Camera Corp. v. NLRB, 340 U.S. 474, [17 S.Ct. 456, 95 L.Ed. 456] (1951).

"Enforcement of the bargaining order may well be the only way to remedy the illegal course of conduct deliberately chosen by petitioner. NLRB v. Winn-Dixie Stores, Inc., 341 F.2d 750 (6th Cir.), cert. denied, 382 U.S. 830, [86 S.Ct. 69, 15 L.Ed.2d 74] (1965); NLRB v. Cumberland Shoe Corp., 351 F.2d 917 (6th Cir. 1965); NLRB v. Delight Bakery, Inc., 353 F.2d 344 (6th Cir. 1965)." Thrift Drug Co. v. NLRB, 404 F.2d 1097, 1099 (6th Cir. 1968).

I would grant enforcement of the entire National Labor Relations Board order.